THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY
THE BANKRUPTCY COURT.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| ------------------------------------------------------------  x | |
| **In re** : | |
| : | |
| **PREMIER ENTERTAINMENT BILOXI** : | **Chapter 11 Case No.** |
| **LLC (d/b/a HARD ROCK HOTEL &** : | **06-50975 (ERG)** |
| **CASINO BILOXI) AND PREMIER** : | |
| **FINANCE BILOXI CORP.** : | |
| **Debtors.** : | **(Jointly Administered)** |
| : | |
| : | |
| ------------------------------------------------------------  x | |

**SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTORS' JOINT
PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Robert A. Byrd, Esq.
Byrd & Wiser
Attorneys at Law
145 Main Street
P.O. Box 1939
Biloxi, MS  39533
(228) 432-8123
(228) 432-7029 (fax)
rab@byrdwiser.com
www.byrdwiser.com

Dated:  February 22, 2007

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................................3

    A.    HOLDERS OF CLAIMS ENTITLED TO VOTE ...........................................4

    B.    VOTING PROCEDURES ..............................................................................5

    C.    CONFIRMATION HEARING .......................................................................6

II.   OVERVIEW OF THE PLAN .............................................................................8

III.  GENERAL INFORMATION .............................................................................12

    A.    OVERVIEW OF CHAPTER 11 ..................................................................12

    B.    CORPORATE STRUCTURE ......................................................................13

        1.    Corporate Structure Chart .......................................................13

        2.    Current Executive Officers and Directors ..............................13

    C.    BACKGROUND ..........................................................................................16

        1.    Hard Rock Hotel & Casino Biloxi ..........................................16

        2.    Reconstruction .........................................................................17

        3.    Business Strategy .....................................................................17

        4.    Marketing .................................................................................17

        5.    Competitive Position ................................................................18

        6.    Design, Development and Construction ...................................19

        7.    Seasonality ...............................................................................19

        8.    Employees ................................................................................19

        9.    Property ....................................................................................20

        10.   Insurance Litigation .................................................................20

        11.   Environmental Matters .............................................................21

    D.    SIGNIFICANT PREPETITION INDEBTEDNESS ....................................21

        1.    The Bonds ................................................................................21

        2.    The Rank Note ..........................................................................21

        3.    The BHR Notes .........................................................................22

        4.    The RAC Construction Agreement and the St. Paul Surety Bond ....................22

        5.    The BHR Bridge Facility .........................................................23

        6.    The Peoples Bank Loan ...........................................................23

        7.    IDR Bonds ................................................................................24

        8.    Insider and Affiliate Claims ....................................................24

        9.    General Unsecured Claims .......................................................25

i

**TABLE OF CONTENTS**
**(continued)**

Page

IV. KEY EVENTS LEADING TO THE COMMENCEMENT OF THE
REORGANIZATION CASES ................................................................25

    A. HURRICANE KATRINA.................................................................25

    B. NEGOTIATIONS WITH THE INDENTURE TRUSTEE AND THE
BONDHOLDERS AND THE SUBMISSION OF THE COMPREHENSIVE
REBUILDING PROPOSAL .............................................................26

    C. INSURANCE DISPUTE..................................................................28

V. THE REORGANIZATION CASES ..........................................................29

    A. FIRST DAY ORDERS ....................................................................29

        1. On September 20, 2006, the Bankruptcy Court issued orders authorizing:
(i) the joint administration of the chapter 11 cases and (ii) the retention of
the Debtors' legal and financial advisors .............................................29

        2. On September 20, 2006, the Bankruptcy Court issued an Order in Aid of
Sections 363, 364 and 1108 Authorizing Debtor to Operate Business,
thereby authorizing the Debtors to: ...................................................30

    B. CHAPTER 11 FINANCING ............................................................30

        1. Cash Collateral ...........................................................................30

        2. The DIP Motion ..........................................................................31

        3. Proposed Exit Financing ...............................................................31

        4. The Disputed Liquidated Damages Escrow ........................................32

    C. HARD ROCK ASSUMPTION MOTION ..........................................33

    D. CREDITORS' COMMITTEE............................................................33

    E. THE SCHEDULES AND BAR DATE ...............................................34

    F. REJECTION AND ABANDONMENT OF CERTAIN PROPERTY ...........34

VI. THE PLAN OF REORGANIZATION .......................................................34

    A. INTRODUCTION...........................................................................34

    B. CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
INTERESTS UNDER THE PLAN OF REORGANIZATION ...................35

        1. Unclassified...............................................................................36

        2. Classified..................................................................................37

    C. MEANS OF IMPLEMENTING THE PLAN .......................................41

        1. Settlement of Claims ....................................................................41

        2. Cancellation of Existing Securities and Agreements .............................41

        3. Surrender of Existing Securities......................................................42

**TABLE OF CONTENTS**
**(continued)**

Page

4.    Incurrence of New Indebtedness .................................................................42

D.    DISPUTED LIQUIDATED DAMAGES ESCROW ........................................42

E.    PLAN PROVISIONS GOVERNING DISTRIBUTION .................................43

1.    Distribution on Account of Allowed Claims..............................................43

2.    Delivery of Distributions.............................................................................43

3.    Manner of Payment .....................................................................................44

4.    Setoff and Recoupment ...............................................................................44

5.    Allocation of Plan Distributions Between Principal and Interest................44

F.    PROCEDURES FOR TREATING DISPUTED CLAIMS ...............................44

1.    Objections ....................................................................................................44

2.    No Distributions Pending Allowance ..........................................................45

3.    Distributions After Allowance ....................................................................45

4.    Resolution of Administrative Expense Claims and Claims .........................45

5.    Estimation of Claims....................................................................................45

G.    PROVISIONS GOVERNING EXECUTORY CONTRACTS AND
      UNEXPIRED LEASES ....................................................................................46

1.    Assumption or Rejection of Executory Contracts .......................................46

2.    Approval of Assumption or Rejection of Executory Contracts and
      Unexpired Leases .........................................................................................46

3.    Inclusiveness ................................................................................................46

4.    Cure of Defaults ...........................................................................................46

5.    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
      Unexpired Leases Rejected Pursuant to the Plan ........................................47

6.    Indemnification Obligations.........................................................................47

7.    Insurance Policies.........................................................................................47

8.    Retiree Benefits ...........................................................................................47

H.    GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS........48

1.    General .........................................................................................................48

2.    Amended Organizational Documents ..........................................................48

3.    New Boards of the Reorganized Debtors .....................................................48

4.    Officers of the Reorganized Debtors............................................................48

5.    New Management Agreements .....................................................................48

I.    CONDITIONS PRECEDENT TO EFFECTIVE DATE ..................................48

iii

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | |
|---|---|---|---|
| | 1. | Conditions Precedent to Effectiveness | 48 |
| | 2. | Waiver of Conditions | 49 |
| | 3. | Satisfaction of Conditions | 49 |
| J. | | EFFECT OF CONFIRMATION | 49 |
| | 1. | Vesting of Assets | 49 |
| | 2. | Binding Effect | 49 |
| | 3. | Discharge of Claims | 49 |
| | 4. | Discharge | 50 |
| | 5. | Exculpation | 50 |
| | 6. | Injunction or Stay | 50 |
| | 7. | Release of Avoidance Actions | 51 |
| K. | | RETENTION OF JURISDICTION | 51 |
| L. | | MISCELLANEOUS PROVISIONS | 52 |
| | 1. | Effectuating Documents and Further Transactions | 52 |
| | 2. | Withholding and Reporting Requirements | 52 |
| | 3. | Corporate Action | 53 |
| | 4. | Modification of Plan | 53 |
| | 5. | Revocation or Withdrawal of the Plan | 53 |
| | 6. | Payment of Statutory Fees | 54 |
| | 7. | Post-Confirmation Date Professional Fees and Expenses | 54 |
| | 8. | Dissolution of the Creditors' Committee | 54 |
| | 9. | Exemption from Transfer Taxes | 54 |
| | 10. | Expedited Tax Determination | 54 |
| | 11. | Governing Law | 54 |
| VII. | | PROJECTIONS AND VALUATION ANALYSIS | 55 |
| | A. | CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS | 55 |
| | | 1. Responsibility for and Purpose of the Projections | 55 |
| | | 2. Pro Forma Financial Projections | 55 |
| VIII. | | CERTAIN FACTORS AFFECTING THE DEBTORS | 56 |
| | A. | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 56 |
| | | 1. Risk of Non-Confirmation of the Plan of Reorganization | 56 |
| | | 2. Non-Consensual Confirmation | 57 |

**TABLE OF CONTENTS**
**(continued)**

Page

3.  Risk of Non-Occurrence of the Effective Date ...................................57
B.  ADDITIONAL FACTORS TO BE CONSIDERED ...............................57
1.  Business Factors and Competitive Conditions.................................57
2.  General Economic Risks ..........................................................61
3.  Reliance on Market Data..........................................................61
4.  Conflicts of Interest................................................................62
5.  The Debtors Have No Duty to Update ..........................................62
6.  No Representations Outside This Disclosure Statement Are Authorized..........62
7.  Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary ........................................................62
8.  No Legal or Tax Advice is Provided to You By This Disclosure Statement.........................................................................62
9.  No Admission Made ...............................................................63
10. Business Factors and Competitive Conditions.................................63
C.  CERTAIN TAX MATTERS ...........................................................63
IX.  CONFIRMATION OF THE PLAN OF REORGANIZATION ......................63
A.  CONFIRMATION HEARING .........................................................63
B.  REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION ....................................................................64
1.  Requirements of Section 1129(a) of the Bankruptcy Code...................64
2.  Requirements of Section 1129(b) of the Bankruptcy Code ..................66
X.  FINANCIAL INFORMATION .............................................................67
XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION ..............................................................67
A.  LIQUIDATION UNDER CHAPTER 7................................................67
B.  ALTERNATIVE PLAN OF REORGANIZATION ................................69
XII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .........69
A.  CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS ....................70
B.  TREATMENT OF THE DISPUTED LIQUIDATED DAMAGES ESCROW ..............71
C.  INFORMATION REPORTING AND WITHHOLDING .............................72
XIII. CONCLUSION .............................................................................72

v

## SUMMARY OF PLAN

The following is a summary of the Debtors' Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated February 22, 2007 (the "Plan"), of Premier Entertainment Biloxi LLC (d/b/a Hard Rock Hotel & Casino Biloxi) ("PEB") and Premier Finance Biloxi Corp. ("Premier Finance," and collectively with PEB, the "Debtors"), the debtors and debtors in possession in these chapter 11 cases. This Second Amended Disclosure Statement (the "Disclosure Statement") describes the Plan and the distributions contemplated thereunder for the Debtors and their creditors.

Premier Finance is a wholly-owned subsidiary of PEB. Under Mississippi law, certain expenditures are exempt from sales tax if purchased with the proceeds from industrial development revenue bonds issued by the Mississippi Finance Corporation. Premier Finance was formed to fund capital expenditures in order to qualify for the tax-exempt status. Premier Finances does not have any material assets or operations.

PEB owns the Hard Rock Hotel & Casino Biloxi (the "Resort"), a full service gaming and entertainment resort, built on approximately 8.5 acres along the Mississippi Gulf Coast in Biloxi, Mississippi. Construction was completed, and a temporary certificate of occupancy was received on August 26, 2005. On August 26, 2005, Ruth's Chris Steak House, the fine dining restaurant at the Resort, and the Hard Rock Café began serving meals, and full service casino and hotel operations were scheduled to commence on August 31, 2005. On August 29, 2005, Hurricane Katrina, the worst natural disaster to ever strike the continental United States, struck and devastated much of the central Gulf Coast. Hurricane Katrina destroyed the Resort's casino and damaged its related facilities, the low-rise building, hotel tower, and parking garage.

Prior to filing for chapter 11 protection, the Debtors had a secured financing instrument in place in the form of the 10¾% First Mortgage Notes due 2012 (the "Bonds"), issued pursuant to that certain indenture dated as of January 23, 2004 as amended (the "Indenture") for $160 million in the aggregate. U.S. Bank National Association ("U.S. Bank") serves as the indenture trustee (the "Indenture Trustee") with respect to the Indenture, held between the Debtors, as issuers, and the Indenture Trustee, as indenture trustee. The Bonds are beneficially held by investors (the "Bondholders").

After the devastation caused by Hurricane Katrina, the Debtors asserted substantial loss claims pursuant to their insurance policies. As a result of several insurance settlements, approximately $160.8 million of insurance proceeds were collected and deposited with U.S. Bank. The Debtors made disbursement requests to U.S. Bank for release of the insurance proceeds in order to rebuild the Resort. The Debtors were not allowed to use the insurance proceeds collected post-Hurricane Katrina for the rebuilding of the Resort, except for limited purposes. The Debtors' inability to gain complete access to the insurance proceeds through negotiation or litigation left PEB with the need for financial reorganization.

Upon commencement of these chapter 11 cases, PEB filed a motion to use cash collateral to gain access to the insurance proceeds to fund the rebuilding of the Resort and to commence operations. Over the Indenture Trustee's and the Bondholders' objections, the Bankruptcy Court granted such motion based on a thirteen-week projection. The use of such cash collateral has since been extended until April 13, 2007.

The Debtors believe that the Plan provides for a 100% recovery to all holders of Allowed Claims. Bondholders will receive principal and accrued unpaid interest in cash on the Effective Date, and to the extent Bondholders are also entitled to receive a prepayment premium or penalty, which the Debtors dispute, it will be paid after resolution of the dispute. Holders of General Unsecured Claims will receive 50% upon the Effective Date of the Plan and 50% sixty days thereafter. An Exit Facility to be

provided by BHR Holdings, Inc., an affiliate of the Debtors, will ensure the Debtors' ability to make such payments if the Plan is consummated before the Debtors can generate cash flow from operations.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

# I.

# INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of equity interests ("Equity Interests") in and Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the United States Bankruptcy Court for the Southern District of Mississippi, Southern Division (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for _____, 2007 at __:__ _.m.[1] (prevailing Central Time). Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A);

- Pro Forma Sources and Uses Summary as of May 1, 2007 (Exhibit B);

- Projected Balance Sheet and Income Statement as of May 1, 2007 (Exhibit C);

- Annual Report for PEB and Premier Finance (on a consolidated basis) on Form 10-K for the fiscal year ended December 31, 2005 (annexed without exhibits) (Exhibit D); and

- Form 10-Q for PEB and Premier Finance (on a consolidated basis) for the quarter ended June 30, 2006 (Exhibit E).

A Ballot for the acceptance or rejection of the Plan will be transmitted after Bankruptcy Court approval of the Disclosure Statement and submitted to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.

On _____, 2007, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, will set forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting

---

[1] Court to set dates.

purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.        HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section VI.

Claims in Class 4 (Peoples Bank Secured Claim), Class 5 (Secured PEB Bond Claims), Class 6 (Secured Premier Finance Bond Claims), Class 7 (General Unsecured PEB Claims), Class 8 (General Unsecured Premier Finance Claims) and Class 10 (Affiliate Claims) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

Claims and Equity Interests in Class 1 (Other Priority Claims), Class 2 (Secured Tax Claims), Class 3 (Other Secured Claims), Class 9 (Rank Note Claim), Class 11 (PEB Equity Interests) and Class 12 (Premier Finance Equity Interests) of the Plan are unimpaired. As a result, holders of Claims and Equity Interests in those Classes are conclusively presumed to have accepted the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Section IX of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section IX of this Disclosure Statement.

THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 4-8 AND 10 VOTE TO ACCEPT THE PLAN.

The Debtors' legal advisor is Byrd & Wiser. The contact information is as follows:

Robert A. Byrd, Esq.
Byrd & Wiser
Attorneys at Law
145 Main Street
P.O. Box 1939
Biloxi, MS  39533
(228) 432-8123
(228) 432-7029 (fax)

**B.**     **VOTING PROCEDURES**

If you are entitled to vote to accept or reject the Plan, a Ballot will be sent for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  Ballots and master ballots ("Master Ballots") should be returned to:

PREMIER ENTERTAINMENT BILOXI, LLC BALLOT PROCESSING
c/o FINANCIAL BALLOTING GROUP LLC
757 THIRD AVENUE, 3RD FLOOR
NEW YORK, NEW YORK  10017

**If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a Master Ballot before the Voting Deadline ( _:__ p.m., prevailing Central Time, _____, 2007).**

**Do not return your notes or securities with your Ballot.**

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY NO LATER THAN _:__ **p.m., prevailing Central Time,** _____, 2007.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set _____, 2007 as the record date for holders of all Claims entitled to vote on the Plan.  Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Financial Balloting Group at (646) 282-1800.

C.      **CONFIRMATION HEARING[2]**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2007 at __:__ _.m. (prevailing Central Time) before the Honorable Edward R. Gaines, United States Bankruptcy Court for the Southern District of Mississippi, Southern Division, Dan M. Russell, Jr. United States Courthouse, 2012 15th Street, Gulfport, MS 39501-6209.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before _____, 2007 at __:__ _.m. (prevailing Central Time) in the manner described below in Section VI.F. of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.  HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO REORGANIZE SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

---

[2] Court to set dates.

THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN AND BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES FOR THE DEBTORS' CREDITORS.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims | Paid in full, in Cash, on the later of the Effective Date or when such Claim becomes Allowed; Claims incurred in the ordinary course of business will be paid when due in the ordinary course of business. | $114,000 | 100% |
| -- | Professional Compensation and Reimbursement Claims | Paid in full, in Cash, in accordance with the order allowing any such Claim. | $500,000 | 100% |
| -- | Priority Tax Claims | Paid in full, in Cash, on the Effective Date, plus interest. | $0 | 100% |
| 1 | Other Priority Claims | Unimpaired. Paid in full, in Cash, on the later of the Effective Date and the date such Claim becomes and Allowed Other Priority Claim or as soon thereafter as is practicable. | $0 | 100% |
| 2 | Secured Tax Claims | Unimpaired. Either (i) paid in full, in Cash, on the Effective Date or (ii) paid in full, in Cash, over a period not exceeding five years from and after the Commencement Date, in equal semi-annual Cash payments with interest at the applicable rate under non-bankruptcy law. | $0 | 100% |

---

[3] The amounts set forth herein are the Debtors' estimates based on the Debtors' books and records and proofs of claims filed to date. Actual amounts will depend upon the final reconciliation and resolution of all Administrative Expense Claims and Claims, and the negotiation of cure amounts. Accordingly, the actual amounts may vary from the amounts set forth herein. The Debtors reserve the right to contest any scheduled Secured Claim.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 3 | Other Secured Claims | Unimpaired.  Either (i) reinstated, (ii) paid in full, in Cash, including interest, on the later of the Effective Date and the date such Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) receive the Collateral securing such Other Allowed Secured Claim. | $720,000 | 100% |
| 4 | Peoples Bank Secured Claim | Impaired.  The holder of the Allowed Peoples Bank Secured Claim shall receive the principal amount of the Peoples Bank Loan on the Effective Date, plus accrued interest thereon at a 7% rate of interest per annum, in Cash on the Effective Date. | $1,301,042 | 100%[4] |
| 5 | PEB Secured Bond Claims | Impaired.  Each holder of an Allowed PEB Secured Bond Claim shall receive its Ratable Proportion of (i) any principal amount of the Bonds outstanding on the Effective Date, plus accrued interest thereon through the Effective Date, in Cash on the Effective Date, and (ii) the amount, if any, of the Disputed Liquidated Damages Escrow to which Bondholders as of the Distribution Record Date are entitled, in Cash solely from the Disputed Liquidated Damages Escrow, promptly after resolution of the Disputed Liquidated Damages Claims by Final Order, including a court-approved settlement.  Indenture Trustee Fees shall be paid in full, in Cash, on the Effective Date or | $164,300,000 | 100% |

---

[4] As described more fully herein, Peoples Bank shall receive 100% of the principal amount of the Peoples Bank Secured Claim at a reduced rate of interest.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery |
|---|---|---|---|---|
| | | upon determination by the Bankruptcy Court, if disputed. | | |
| 6 | Premier Finance Secured Bond Claims | Impaired. Each holder of an Allowed Premier Finance Secured Bond Claim shall receive its Ratable Proportion of (i) any principal amount of the Bonds outstanding on the Effective Date, plus accrued interest thereon through the Effective Date, in Cash on the Effective Date, and (ii) the amount, if any, of the Disputed Liquidated Damages Escrow to which Bondholders as of the Distribution Record Date are entitled, in Cash solely from the Disputed Liquidated Damages Escrow, promptly after resolution of the Disputed Liquidated Damages Claims by Final Order, including a court-approved settlement. Indenture Trustee Fees shall be paid in full, in Cash, on the Effective Date or upon determination by the Bankruptcy Court, if disputed. | $164,300,000 | 100%[5] |

---

[5] The Bondholders and U.S. Bank dispute that the payment terms proposed by the Debtors constitute payment in full.

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 7 | PEB General Unsecured Claims | Impaired. Each holder of an Allowed General Unsecured PEB Claim (which Allowed Claim shall include postpetition interest at the federal judgment rate as of the Petition Date) shall receive Cash in an amount equal to fifty percent (50%) of its Allowed General Unsecured PEB Claim on the Effective Date, and the remaining fifty percent (50%) within sixty (60) days thereafter, or as soon as practicable after the Allowed General Unsecured Claim becomes an Allowed General Unsecured Claim. All Allowed General Unsecured PEB Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations come due. | $36,554,078 | 100% |
| 8 | Premier Finance General Unsecured Claims | Impaired. Each holder of an Allowed General Unsecured Premier Finance Claim (which Allowed Claim shall include postpetition interest at the federal judgment rate as of the Petition Date) shall receive Cash in an amount equal to fifty percent (50%) of its Allowed General Unsecured Premier Finance Claim on the Effective Date, and the remaining fifty percent (50%) within sixty (60) days thereafter, or as soon as practicable after the Allowed General Unsecured Claim becomes an Allowed General Unsecured Claim. | $0 | 100% |
| 9 | Rank Note Claim | Unimpaired. The Rank Note shall be reinstated under the terms of the Plan. | N/A | N/A |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount[3] | Approximate Percentage Recovery |
|---|---|---|---|---|
| 10 | Affiliate Claims | Impaired. Each holder of an Allowed Affiliate Claim shall be paid out of available cash from operations post-Effective Date. | $11,922,000 | 100% |
| 11 | PEB Equity Interests | Unimpaired. Unaltered by terms of Plan. | N/A | N/A |
| 12 | Premier Finance Equity Interests | Unimpaired. Unaltered by terms of Plan. | N/A | N/A |

For detailed historical and projected financial information and valuation estimates, see Section VII below.

## III.

## GENERAL INFORMATION

### A.    OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the commencement date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.    CORPORATE STRUCTURE**

1.    Corporate Structure Chart

On or about April 25, 2006, LUK-Ranch Entertainment, LLC ("LRE"), a Delaware limited liability company and a wholly-owned subsidiary of Leucadia National Corporation ("Leucadia"), indirectly acquired an interest in PEB by indirectly acquiring from AA Capital Equity Fund, L.P. ("AA Capital") and AA Capital Biloxi Co-Investment Fund, L.P. ("AA Investment," and with AA Capital, the "Sellers") all of Sellers' equity interest in PEB.

The chart below provides a general overview of PEB's corporate structure, including certain non-debtor entities:



Under the terms of the GAR, LLC operating agreement, LRE appoints the board of managers of GAR and, as a result, under PEB's operating agreement, LRE appoints the board of managers of PEB.

2.    Current Executive Officers and Directors

The following table sets forth the name, age and position of each of the current members of PEB's board of managers and executive officers and the current members of the board of directors and executive officers of Premier Finance:

13

| Name | Position |
| --- | --- |
| Joseph Billhimer | President, Chief Executive Officer of Premier Entertainment Biloxi; President of Premier Finance |
| David S. Ross | Member of Board of Managers of Premier Entertainment Biloxi; Director of Premier Finance |
| Roy Anderson, III | Member of Board of Managers of Premier Entertainment Biloxi; Director of Premier Finance |
| Gregg R. Giuffria | Member of Board of Managers of Premier Entertainment Biloxi; Director of Premier Finance |
| Ian M. Cumming | Member of Board of Managers of Premier Entertainment Biloxi; Director of Premier Finance |
| Joseph S. Steinberg | Member of Board of Managers of Premier Entertainment Biloxi; Director of Premier Finance |
| Lawrence S. Hershfield | Chairman of Board of Managers of Premier Entertainment Biloxi; Director of Premier Finance |
| Joseph M. O'Connor | Member of Board of Managers of Premier Entertainment Biloxi; Director of Premier Finance |
| Robert A. Callaway | Secretary and General Counsel of Premier Entertainment Biloxi LLC |
| Todd J. Raziano | Senior Vice President and Chief Financial Officer of Premier Entertainment Biloxi LLC |
| Kevin M. O'Sullivan | Vice President of Casino Operations |
| Karl P. Bulot | Project Manager and Vice President of Support Services |

Joseph Billhimer served as President and General Manager of Grand Casino Gulfport from June 2000 to July 2003, which was owned by Caesars Entertainment, Inc. Previously, Mr. Billhimer was the Vice President and General Manager of Casino Magic Bay St. Louis where he was responsible for all operations, including the operations of the hotel and the golf course. Mr. Billhimer joined Casino Magic Bay St. Louis as a Casino Manager in 1992. He was thereafter promoted, first to the Assistant General Manager of Casino Magic Bay St. Louis, and then Assistant General Manager of Casino Magic Bossier City, prior to taking on the General Manager position at the Bay St. Louis property.

David S. Ross has over 25 years of experience in the development of large-scale commercial and residential projects, including the sales, marketing and financing of such developments and the management of casino and hotel properties. From 1999 to the present, Mr. Ross has served as the President of Millamax Development Corp., a company he founded to assemble the Hard Rock Hotel & Casino Biloxi property. In 1993, Mr. Ross founded Millamax, Inc., where he served as the President and Chief Executive Officer from 1993 to 1999. At Millamax, Inc., he arranged project financing and developed the Ritz-Carlton San Juan Hotel, Spa & Casino and developed the 230-foot M/V Max One luxury casino and entertainment vessel deployed under bareboat charter from Key West, Florida and Sheepshead Bay, New York.

Roy Anderson, III has served, since 1993, as the President and Chief Executive Officer of Roy Anderson Corp., a family-owned construction organization. In 1982, Mr. Anderson joined Roy Anderson Corp. and was named as an Executive Vice President in 1984. Roy Anderson Corp., founded in 1955, is a general construction company specializing in large-scale construction projects. Mr. Anderson has served on the board of the Gulfport Council Chamber of Commerce, National Board of

Directors of Associated General Contractors of America and various other national, state and local organizations. In 1990, Mr. Anderson also served as President of the Mississippi Associated General Contractors. Mr. Anderson is also an attorney, with a law degree from the University of Mississippi School of Law, and is a member of the Mississippi Bar.

Gregg R. Giuffria has served as a private investor from 2002 to the present. He served as the Chief Executive Officer of Outland Development LLC from 2000 to 2002, which was subsequently sold to Voyager Entertainment International, Inc., where he was instrumental in the pre-development of the Voyager Las Vegas project and the development of the Star of Shanghai. From 1997 to 2001, Mr. Giuffria served as the President and Chief Operating Officer of Full House Resorts, Inc., a hotel and casino company. From 1995 to 1997, Mr. Giuffria served as the Vice President of Corporate Development for Casino Data Systems, Inc. Mr. Giuffria owned "The Telnaes Patent," an important gaming/casino patent, which he subsequently sold to Casino Data Systems, Inc. and International Gaming Technology.

Ian M. Cumming has served as a director and Chairman of the Board of Leucadia since June 1978. In addition, he is Chairman of the Board of The FINOVA Group Inc. Mr. Cumming is also a director of Skywest, Inc., a Utah-based regional air carrier, and HomeFed Corporation, a publicly-held real estate development company.

Joseph S. Steinberg has served as a director of Leucadia since December 1978 and as President since January 1979. He is also a director of FINOVA and Jordan Industries, Inc. In addition, Mr. Steinberg is Chairman of the Board of HomeFed.

Lawrence S. Hershfield has served as Chief Executive Officer of Ranch Capital, LLC since 2002. Mr. Hershfield also serves as Chairman of Hawaiian Holdings, the parent company of Hawaiian Airlines. Previously, Mr. Hershfield spent seventeen years with Leucadia, including as Executive Vice President and President of Leucadia International Corp., among other Leucadia-owned or controlled companies.

Joseph M. O'Connor is an Assistant Vice President of Leucadia, responsible for the management of several commercial and retail real estate projects and the sourcing and analysis of investment opportunities. Prior to joining Leucadia in 2001, Mr. O'Connor was an associate at International Real Returns, a New York based merchant bank that provided investment banking services to several international clients and made principal investments across a variety of industries. From 1997 through 1999, he worked in the financial institutions group in the investment banking division of Goldman, Sachs & Co.

Robert A. Callaway has more than thirty years of legal experience, including twenty-four years of legal practice related to gaming law. Prior to joining Hard Rock, Mr. Callaway was General Counsel for the Robert R. Williams Companies in Mobile, Alabama and Pensacola, Florida from December 2001 until 2004. From 1994 to January 2001, Mr. Callaway served as Executive Vice President and General Counsel for Casino Magic Corp. for their Biloxi and Bay St. Louis, Mississippi properties which were acquired by Pinnacle Entertainment, Inc. in 1998. Prior to joining Casino Magic Corp., from 1987 to 1994, he was a Partner with the Nevada law firm of Beckley, Singleton, DeLanoy, Jemison & List, CHTD, with offices located in Las Vegas and Reno, where he specialized in gaming law practice. From 1982 to 1987, Mr. Callaway was employed as Counsel to the Nevada Gaming Commission and State Gaming Control Board in the Gaming Division of the Northern Nevada Office of the State of Nevada Attorney General's Office. He also served from 1976 to 1981 as Trial Counsel for the State of Nevada's Attorney General's Office and as Clerk for the Nevada Supreme Court from 1974 to 1976.

Todd J. Raziano served as Senior Vice President and Chief Financial Officer for Beau Rivage Resorts, Inc. in Biloxi, Mississippi from February 2003 through August 2005. Previously, Mr. Raziano was the Vice President and General Manager of Casino Magic in Bay St. Louis, Mississippi. Mr. Raziano joined Casino Magic in 1994 and held the position of Director of Finance for both the Biloxi and Bay St. Louis properties and Assistant General Manager for the Bay St. Louis property prior to ascending to the position of General Manager. Prior to entering the gaming industry, Mr. Raziano, who is a Certified Public Accountant, was a manager with the New Orleans office of KPMG Peat Marwick.

Kevin M. O'Sullivan served as Vice President Slot Operations for Horseshoe Hotel & Casino in Tunica, Mississippi from 1998 to September 2004 which is owned by Harrah's Entertainment, Inc. Mr. O'Sullivan was responsible for all slot operations including all slot hosts and player development. Prior to being promoted to Vice President Slot Operations, Kevin was the Director Slot Operations from October 1993 to 1998 for Horseshoe Hotel & Casino.

Karl P. Bulot served as Regional Vice President of Facilities for Caesars Entertainment, Inc.'s Mid South Region from February 2000 to April 2004. Previously, Mr. Bulot was Vice President of Facilities at the Grand Casino Gulfport and Biloxi from October 1993 to February 2000 which was owned by Caesars Entertainment, Inc. Prior to entering the gaming industry, Mr. Bulot worked in the hotel industry in Development/Facilities for Hyatt Fairmont and Servico Hotels and Resorts.

## C.    BACKGROUND

1.    Hard Rock Hotel & Casino Biloxi

PEB was formed on October 18, 2002 and commenced operations on March 27, 2003. Since its formation, it has been in the process of developing the Hard Rock Hotel & Casino Biloxi (the "Resort"), a full service gaming and entertainment resort, built on approximately 8.5 acres along the Mississippi Gulf Coast in Biloxi, Mississippi.

PEB[6] began construction of the Resort in January 2004 and completed construction on time and on budget in August 2005. On August 29, 2005, Hurricane Katrina destroyed the casino and damaged related facilities, the low-rise building, hotel tower and parking garage.

To date, PEB's primary operating activities have included applying for certain necessary permits, licenses and regulatory approvals to enable it to own, construct and manage the operations of and engage in development activities for the Resort, purchasing the land on which the Resort is located, entering into a licensing agreement with Hard Rock Hotel Licensing, Inc. ("Hard Rock Licensing") to obtain the right to use and develop the Hard Rock brand name, and pursuing insurance claim settlements related to Hurricane Katrina, and pursuing the use of insurance proceeds in negotiations and litigation with the Indenture Trustee and the Bondholders.

Upon reconstruction, the Resort will feature 1,500 slot machines and 50 table games, five restaurants (including a Hard Rock Café), a full service spa, a 5,200 square foot "Hard Rock" pool and beach area, 3,000 square feet of dedicated retail space, an eleven-story hotel with 318 rooms and suites and a Hard Rock Live! entertainment venue with a capacity of 1,200 persons.

---

[6] As PEB is the operating arm of the Debtors, in this Section III.C., the term "PEB" will be used to discuss the collective Debtors' operating history and business plans.

2.      Reconstruction

To date, PEB has reached settlements and received proceeds totaling $160.8 million under its comprehensive blanket insurance policies. Only approximately $13.0 million of $14.0 million aggregate face value of insurance policies issued by James River Insurance Company remains unsettled and is currently in litigation.

In working with its construction experts, PEB has estimated the cost of debris removal and reconstruction of destroyed property and equipment to be approximately $120.0 million. PEB believes the monetary settlement of claims under its insurance policies will be sufficient to reconstruct the property similar to its condition immediately preceding Hurricane Katrina. As of January 31, 2007, approximately $50,600,000 of remediation and reconstruction costs have been incurred and PEB estimates that it has completed approximately 55% of the reconstruction.

3.      Business Strategy

The cornerstone of PEB's strategy is to leverage the "Hard Rock" brand name into a successful gaming and entertainment venue in the Mississippi Gulf Coast market. Conceived in 1971 with the founding of the first Hard Rock Café in London, the Hard Rock name has gained worldwide recognition and is synonymous with a unique brand of entertainment which has attracted a large customer base. Through the employment of the Hard Rock strategy, PEB plans to distinguish the Resort from its competitors in the Mississippi Gulf Coast market. PEB also believes that the Hard Rock concept will appeal to a broad demographic group as a result of the music, memorabilia and entertainers that will be featured on the property. Key elements of PEB's strategy include the following:

- Providing a distinctive, fun and vibrant entertainment experience with a strong emphasis on music that will have an enduring appeal to the resort's customers;

- Creating an upscale gaming resort cluster by strategically locating the Resort within walking distance (approximately 100 yards) from the MGM Mirage's Beau Rivage Resort – the largest hotel and casino in the Mississippi Gulf Coast market;

- Maximizing customer playing time and casino utilization by (i) targeting a youthful demographic on weekends and evenings through use of the traditional Hard Rock theme to provide a broad array of entertainment offerings in an energetic gaming atmosphere, and (ii) targeting the local population on weekdays through direct marketing programs along with offering bus programs and a customer-friendly competitive rewards program with benefits that extend play;

- Providing high quality, superior levels of customer service by hiring friendly, energetic and well-trained staff; and

- Capitalizing on the local experience of PEB's President and Chief Executive Officer, Joseph Billhimer, in the opening and operating of gaming properties.

4.      Marketing

PEB's marketing strategy is to position the Resort as a full service gaming, boutique hotel and entertainment resort catering to the Mississippi Gulf Coast marketplace and the southern region of the United States. Initially, PEB plans to market heavily to its primary and secondary markets. The Resort's primary market consists of the area within 100 miles of the casino, which includes the nearby

cities of Mobile, Alabama and New Orleans, Louisiana, where sixteen casinos existed prior to Hurricane Katrina. According to The Innovation Group, a marketing research firm, in 2004 there were approximately 2.1 million adults living within a 100-mile radius of the resort's site. The average household income within the primary market exceeded $50,000 in 2004. The Resort's secondary market is the area within a 200-mile radius of the casino, which includes the cities of Baton Rouge, Louisiana; Pensacola, Florida; and Jackson, Mississippi. In 2004, there were an additional 2.5 million adults living between 101 and 200 miles of the Resort. PEB intends to emphasize the local market to drive mid-week business and attempt to capitalize on the resort's geographic location and the cluster formed with the Beau Rivage. As PEB establishes a regular customer base and increases its database, it plans to extend its reach and market the Resort as a full-service destination resort. Prior to the reopening of the Resort, PEB plans to create market awareness through advertising across a number of mediums including television, radio, print, internet, direct mail, area visitor guides and billboards.

PEB believes that the Hard Rock concept and unique brand of entertainment appeals to a broad range of customers. To attract the broadest customer base possible, PEB will implement marketing programs tailored to each customer demographic. For example, to attract a more mature local audience and maximize the resort's capacity during mid-week and other "soft" periods, PEB will implement marketing promotions that cater to slot players. Such promotions may include chances to win automobiles, cash drawings, and use of promotional credits. PEB management's knowledge of the local gaming market will assist the company in identifying and implementing effective mass advertising promotions. Additionally, PEB plans to enter into exclusive and agreements with bus and tour companies to facilitate travel to the Resort. To attract a more youthful demographic, PEB plans to aggressively promote the entertainment aspect of the Resort.

PEB believes effective use of database marketing is a critical component of its marketing strategy. By utilizing IGT Advantage Gaming System Patron Management, PEB plans to create an aggressive player development program to target specific customers and incentivize them according to their preferences. The customer loyalty program will use the information about the gaming, hotel, food and beverage and retail spending habits of resort customers obtained during their visits to the Resort. Properly identifying the type of customer will allow PEB to reward patrons according to their specific tastes and habits. Such rewards will include discounted and/or complimentary food and beverage items and hotel rooms, preferred parties, concerts, invitation only events and golf tournaments. By maintaining a thorough customer database, PEB will attempt to capture customers' total worth in both gaming and non-gaming revenues and further induce them to make repeat visits to the Resort.

5.    Competitive Position

The devastation caused by Hurricane Katrina has dramatically changed the competitive nature of the Gulf Coast gaming market. All twelve casinos in the Gulf Coast gaming market were severely damaged and shut down by the impact of Hurricane Katrina. Currently, ten casinos are operating in the market, and all that had planned to reopen have reopened except for Hard Rock.

When reconstruction is completed, the Resort will have high visibility with its strategic location approximately 100 yards from the 1,740-room Beau Rivage Resort & Casino, the highest revenue-grossing property in the market prior to Hurricane Katrina. Following Hurricane Katrina, the Beau Rivage received a $500 million renovation and is expected to maintain a strong customer following in the Mississippi Gulf Coast market, an expectation on which PEB intends to capitalize. Additionally, PEB believes its close proximity to the Beau Rivage will provide synergies and attract new gaming customers by creating a "cluster" that will enable customers to park once and visit both hotels and casinos. PEB anticipates its competitive position will also be strengthened by the worldwide familiarity of the Hard Rock brand.

6.      Design, Development and Construction

Paul Steelman Ltd. of Las Vegas, Nevada, an international architecture firm with significant experience in creating architectural designs for the entertainment, hotel and gaming markets, was the architect and designer of the Resort. Paul Steelman Ltd. has designed major gaming projects for such companies as MGM Mirage, Harrah's Entertainment Corporation, Park Place Entertainment Corporation, Hard Rock Hotel, Inc., Hyatt Corporation and Stratosphere Gaming Corporation.

Roy Anderson Corp. ("RAC") of Gulfport, Mississippi constructed the Resort and performed certain remediation and debris removal work in the aftermath of Hurricane Katrina. RAC specializes in large-scale construction projects and has constructed nine casinos in the Mississippi Gulf Coast region. Roy Anderson III, the President and Chief Executive Officer of RAC, is also a member of GAR, LLC, PEB's sole member, and a member of PEB's Board of Managers.

7.      Seasonality

PEB does not have an operating history. It anticipates that activity at the Resort may be modestly seasonal, with stronger results expected during the second and third quarters due in part to the relatively higher levels of tourism in the Mississippi Gulf Coast market during this time of the year and weaker results in the fourth quarter. In addition, operations may be impacted by adverse weather conditions and fluctuations in the tourism business generally. Accordingly, results of operations may fluctuate from quarter to quarter and the results for any one quarter may not be indicative of results for future quarters.

8.      Employees

PEB employed approximately 1,350 employees immediately prior to Hurricane Katrina and had assembled a strong team of gaming industry experts, well-versed in all aspects of casino development, construction and management -- most of whom were involved with the opening of several of the casinos on the Mississippi Gulf Coast and in other regional markets. As of the date of this Disclosure Statement, PEB had approximately eighteen employees, all of whom are engaged in the efforts to rebuild and repair the property to its original condition, pursue insurance claim recoveries and prepare the business for operations.

PEB has employment agreements with three of its employees, Joseph Billhimer, PEB's Chief Executive Officer; Robert Callaway, PEB's General Counsel; and Todd Raziano, PEB's Senior Vice President and Chief Financial Officer. Each of these agreements was executed prior to the Petition Date and will be assumed under the Plan.

Effective June 14, 2006, PEB entered into an amended and restated employment agreement with Joseph Billhimer (the "Billhimer Agreement"). Pursuant to the Billhimer Agreement, Mr. Billhimer will act as PEB's President and Chief Executive Officer and will receive an annual base salary of $360,000 for his services performed prior to the opening of the Hotel/Casino. Once the Hotel/Casino opens to the public for gaming, Mr. Billhimer's annual base salary will be $350,000, subject to increase at the discretion of PEB's Board of Managers. In the event Mr. Billhimer and PEB have not reached an agreement on mutually acceptable terms to enter into a new employment agreement by July 1, 2007, Mr. Billhimer, in his sole discretion, may terminate the Billhimer Agreement on or after such date; *provided*, *however*, Mr. Billhimer provides written notice of such intent to PEB at least six (6) weeks prior to the date of termination.

If Mr. Billhimer is terminated without cause or resigns for certain enumerated reasons, he will receive all accrued and unpaid salary, an amount equal to one year's base salary and any bonus

amounts that would otherwise be payable, if at all, based on the annualization of the year-to-date EBITDA, as accrued by PEB in the year of such termination. In addition, he will continue to participate in all PEB benefit plans for one year from the date of termination or until he accepts employment with another employer or a consulting relationship with a third party that provides Mr. Billhimer with substantially similar compensation and medical benefits.

Effective as of June 15, 2006, PEB also entered into employment agreements with Robert Callaway and Todd J. Raziano (collectively the "Executives"). The term of each agreement is for one year beginning June 5, 2006 and ending June 4, 2007. Mr. Callaway will receive an annual base salary of $170,000, and Mr. Raziano will receive an annual base salary of $175,000. The Executives will be eligible to participate in PEB's bonus program for executive personnel in effect from time to time. Any bonus paid to an Executive thereunder will be in the sole discretion of PEB. The Executives shall also be entitled to vacation in accordance with PEB's policies and participation in all benefit programs in effect or which may be developed for similarly situated executive personnel of PEB from time to time. If either Executive is terminated without cause, the Executive shall be entitled to receive his base salary and to participate in PEB's benefit plans for the longer of three months or the end of the term of the employment agreement. Additionally, each of the Executive employment agreements contains certain covenants restricting the Executive's ability to compete with PEB for ninety days, in the event of termination for cause, or for so long as the Executive receives compensation from PEB, in the event the Executive was terminated without cause.

9.    Property

PEB owns an 8.5 acre site on the Mississippi Gulf Coast in Biloxi, Mississippi, a portion of which is submerged tidelands leased from the State of Mississippi. The subject lease was assumed by PEB by virtue of an order entered by the Bankruptcy Court on January 31, 2007.

Prior to Hurricane Katrina, the Resort was approximately 388,000 square-feet in size and featured a casino (with approximately 1,500 slot machines, fifty table games and six poker tables), a 318-room hotel, a Hard Rock Live! entertainment venue, a Hard Rock retail store, a tropical-themed Hard Rock beach pool, restaurants, including a Hard Rock Café and a Ruth's Chris Steakhouse, a full service fitness spa, a top floor lounge, and a parking garage with approximately 1,600 spaces.

10.    Insurance Litigation

To date, PEB has reached settlements and received proceeds totaling $160.8 million under its comprehensive blanket insurance policies. Only approximately $13.0 million of $14.0 million aggregate face value of insurance policies issued by James River Insurance Company ("James River") remains unsettled and is currently in litigation.

On January 10, 2006, PEB filed a complaint in the United States District Court for the Southern District of Mississippi, Southern Division against James River seeking a declaratory judgment that the James River insurance policy provide coverage for the water damage to the Resort property resulting from Hurricane Katrina. U.S. Bank intervened as a party-plaintiff. PEB also sought compensatory and punitive damages, as well as attorney's fees, from James River. In addition, on June 30, 2006, PEB filed a second amended complaint, adding a count for declaratory relief against James River for wind damage sustained to the property during Hurricane Katrina. On August 11, 2006, James River filed its answer to PEB's second amended complaint, which included a counterclaim to reform the James River insurance policy. On September 5, 2006, PEB filed a motion to dismiss James River's counterclaim and a motion for partial judgment on the pleadings. PEB intends to vigorously pursue this action; however, no assurance can be given as to the results of this litigation. On February 7, 2007, the District Court ordered the parties to mediation while leaving the pending litigation timelines in place.

See also the discussion of certain litigation concerning the Bonds in Section III.D. below.

11.    Environmental Matters

PEB will operate its business near and over the water on the Mississippi Gulf Coast. PEB is, and upon reconstruction of the Resort will be, subject to various federal, state and local laws, ordinances and regulations that (1) govern activities or operations that may have adverse environmental effects, such as discharges to air and water, as well as the handling and disposal of hazardous material or solid or hazardous wastes, and (2) may impose joint and several liability on current and former property owners or operators for the costs of investigation, removal and remediation of hazardous substances or wastes related to the environment without regard to fault. PEB currently has not identified any such issues associated with its property that could reasonably be expected to have an adverse effect on PEB or the results of it operations. However, it is possible that historical or neighboring activities have affected, or the proposed reconstruction and operation of the Resort will affect, PEB's property and, as a result, material obligations or liabilities under environmental laws could arise in the future which may have a material adverse effect on PEB or its operations.

PEB is committed to a long-term environmental protection program that reduces emissions of hazardous materials into the environment, as well as to the remediation of existing environmental concerns should any be identified in the future.

D.    **SIGNIFICANT PREPETITION INDEBTEDNESS**

1.    The Bonds

Pursuant to the Indenture, U.S. Bank serves as the Indenture Trustee with respect to the Bonds issued by the Debtors. The Bonds are beneficially held by the Bondholders.

Pursuant to the Indenture and that certain Cash Collateral and Disbursement Agreement dated January 23, 2004 (the "Disbursement Agreement") related thereto among the Debtors, the Indenture Trustee, U.S. Bank, as disbursement agent, and Professional Associates Construction Services, Inc., the proceeds of the Bonds were used for the design, construction, furnishing, and opening of the Resort. The Disbursement Agreement established the conditions for funding construction costs and the procedures for approving construction change orders and amendments to the construction budget and schedule.

The obligations of the Debtors evidenced by the Bonds, the Indenture, and related documents are collateralized and secured by first priority liens on the Resort and the Debtors' related rights, including a deed of trust on certain real property related to the Resort and improved with, among other things, a hotel, parking garage and restaurants, and a security agreement granting a lien on substantially all of the personal property rights of the Debtors, including, without limitation, substantially all personal property and insurance proceeds related to the Resort. Moreover, the Debtors are obligated to create and maintain a perfected security interest in favor of the Indenture Trustee in newly acquired assets to the extent not covered by existing documentation.

2.    The Rank Note

On January 23, 2004, PEB borrowed $10.0 million in the form of a junior subordinated note (the "Rank Note") due August 1, 2012 from Rank America, Inc. ("Rank America"), an affiliate of The Rank Group Plc, which owns Hard Rock Licensing. Interest on the Rank Note accrues at a rate of 15% per annum and is payable semiannually. If PEB had opened as planned, the first interest payment would have been due on February 1, 2006. Accrued interest at each semiannual interest payment date prior to opening is added to the principal balance. PEB will be required to pay a premium of 3% of the

principal amount of the Rank Note when it is repaid. Such premium is being accrued over the term of the Rank Note. On April 25, 2006, LRE acquired the Rank Note. In the event of a change of control or if the Hard Rock License Agreement is terminated and the project becomes owned, operated or licensed by a Hard Rock competitor, PEB may be required to repay all amounts due under the Rank Note. In addition, PEB may be required to make mandatory quarterly prepayments as calculated under the terms of the Rank Note once PEB opens the Resort after reconstruction. As of this date, LRE has not required PEB to prepay the Rank Note as a result of the change of control event, which occurred on April 25, 2006 when LRE indirectly acquired PEB. The Rank Note is subordinated to payment of the Bonds. Under the Plan, the Rank Note will be reinstated and paid out of Available Cash after the reopening of the Resort post-Effective Date. No payments in respect of the Rank Note will be made until after the holders of the Allowed Secured Bond Claims have received all principal plus accrued interest on the Bonds through the Effective Date, and the Disputed Liquidated Damages Escrow has been funded to satisfy the Disputed Liquidated Damages Claims, to the extent allowed.

3.     The BHR Notes

In order to assist with reconstruction and rebuilding efforts, on May 23, 2006, BHR Holdings, Inc. ("BHR") loaned PEB $8 million by virtue of an unsecured promissory note (the "BHR $8 Mil Note"). On September 18, 2006, BHR loaned PEB an additional $100,000 by virtue of an unsecured promissory note (together with the $8 Mil Note, the "BHR Notes"). The BHR Notes bear interest at 12% per annum and are due and payable on the earlier of May 23, 2007 and the date on which sufficient insurance proceeds become available to PEB to repay the principal and interest due on the BHR Notes in full. Under the Plan the BHR Notes will be paid following the Effective Date from available cash.

BHR is a subsidiary of Leucadia and, through LRE, is the indirect controlling member of GAR, LLC.

4.     The RAC Construction Agreement and the St. Paul Surety Bond

On June 16, 2006, PEB entered into an amended construction contract (the "RAC Construction Agreement") with RAC to rebuild the casino portion of the Resort and to renovate and repair the existing hotel tower, low-rise building, parking garage and pool and deck area. The RAC Construction Agreement is an amendment and restatement of the Agreement between Owner and Contractor, by and between PEB and RAC (the "Original RAC Agreement"), dated December 24, 2003. The basis of payment due under the RAC Construction Agreement is the cost of work plus a fee not to exceed a guaranteed maximum price of approximately $78.3 million. Such amount includes a design contingency of approximately $3,931,732. Substantial completion of the work is to be achieved on or before July 4, 2007. Monthly progress payments are required after RAC submits all required information to PEB and the project architect and the independent construction consultant for U.S. Bank. Payments made by PEB will be net of amounts retained pending construction progress ranging, from zero to 10%. Whenever work is 50% complete and performed in accordance with the project schedule in the opinion of the project architect, then 50% of the retainage will be paid to RAC and 5% on all subsequent project payments shall be retained thereafter.

St. Paul Fire and Marine Insurance Company ("St. Paul") issued a payment and performance bond (the "Surety Bond") in January 2004 to cover the value of the Original RAC Agreement. The work covered by the Surety Bond was completed just prior to Hurricane Katrina. When the Original RAC Agreement was restated, St. Paul required that the RAC Construction Agreement make clear that the previously issued Surety Bond extended solely to the Original RAC Agreement and did not extend to work performed thereafter.

The Indenture does not require a payment and performance bond, such as the Surety Bond. Because the Debtors (i) are familiar with RAC and its reputation as a competent, diligent general contractor, operating on the Mississippi Gulf Coast for more than 50 years, and (ii) approximately 75% of the value of the RAC Construction Agreement is already bonded through the Subguard Program, underwritten by Zurich-North American, which bonds the performance (including materials) of all critical subcontractors, the Debtors believe the Surety Bond is no longer necessary. To date, the Indenture Trustee has not received the permission from the Majority Bondholders to abrogate the necessity of the Surety Bond. If forced to extend the Surety Bond, the cost to rebuild the Resort will increase by approximately $780,000, the cost of the premium for the Surety Bond to cover the RAC Construction Agreement.

Roy Anderson, III is a member of the Board of Managers of PEB and a member of GAR LLC, the beneficial owner of all of the equity interests in PEB ("GAR"), as well as the President and Chief Executive Officer of RAC. PEB believes that the terms of the RAC Construction Agreement are similar to those that could otherwise be received from a third party and are, on the whole, no less favorable to PEB than the terms of the original construction contract between PEB and RAC.

    5.    The BHR Bridge Facility

Because the Debtors did not have access to their Insurance Proceeds (defined below) for the purpose of rebuilding the Resort (as discussed below), concurrently with PEB's entry into the RAC Construction Agreement and in conjunction with the Rebuilding Proposal (defined below) by and between the Debtors and the Indenture Trustee, PEB entered into a receivables purchase agreement (the "BHR Bridge Facility") with BHR and RAC, pursuant to which BHR agreed to purchase up to $40.0 million of receivables due to RAC by PEB under the RAC Construction Agreement if such receivables are past due for more than 10 days. The BHR Bridge Facility bears interest at 12% per annum based on funds expended in accordance with the terms and conditions of the RAC Construction Agreement.

    6.    The Peoples Bank Loan

Pursuant to a loan agreement (the "Peoples Bank Loan") dated August 15, 2005, The Peoples Bank of Biloxi, Mississippi ("Peoples Bank"), and Orix Financial Services, Inc.[7] agreed to advance up to $10,000,000.00 to PEB to finance the acquisition of certain furniture, fixtures and equipment for the Resort. Prior to Hurricane Katrina, only a portion of the loan facility had been advanced, in the principal amount of $1,250,000. Peoples Bank was duly listed as a loss payee pursuant to the Debtors' applicable insurance policies. From Insurance Proceeds received by Debtors, a sum sufficient to satisfy the secured claim of Peoples Bank was remitted to and has been retained by U.S. Bank in a separate escrow account, along with proceeds attributable to other similarly situated lenders.

The Peoples Bank Loan provided for interest at the rate of LIBOR, plus 4.25%. Pursuant to the Plan, the Debtors propose to pay Peoples Bank, on the Effective Date, the sum of $1,250,000.00, representing its outstanding principal loan balance, plus interest at the rate of 7% per annum thereon from the date of loss. The Debtors contend that the contractual interest rate was an appropriate rate of interest for the proposed loan facility, which was never fully funded, and further submit that a 7% fixed rate of return is fair and reasonable in light of the limited debt facility ultimately made available to the Debtors.

_____

[7] After Hurricane Katrina, Orix withdrew from the Peoples Bank Loan, leaving Peoples Bank as the sole lender thereunder.

7.    IDR Bonds

In January 2004, the Debtors entered into a series of transactions involving the Mississippi Business Finance Corporation enabling the Debtors to acquire up to $60,000,000 of certain products in connection with the construction of the Hard Rock Hotel & Casino without incurring state sales tax. Upon a request to U.S. Bank, acting as disbursement agent, for funds for such a purchase, the monies would be transferred to Premier Finance Biloxi Corp. so that it could purchase Industrial Development Revenue ("IDR") Bonds. The proceeds from the sale of these Bonds would, thereafter, be loaned to Premier Entertainment Biloxi LLC to complete the purchase of the product. Of the $60,000,000 in IDR Bonds originally available to Debtor for this purpose, approximately one-half remain.

Due to the considerable cost savings still to be realized from this program as the Debtors rebuild, repair, and refurbish the Resort; and because this opportunity remains available to the Debtors through the end of 2007, Premier Finance Biloxi Corp. shall assume all of its obligations with regard to the IDR Bonds and no rights of any parties relating to the IDR Bonds shall be impaired under the Plan. The IDR Bonds are governed by an indenture that is independent of the Indenture governing the Bonds issued by the Debtors in connection with the original construction of the Hard Rock Hotel & Casino. Nevertheless, as with this latter Indenture, U.S. Bank serves as trustee under the IDR Bond Indenture.

8.    Insider and Affiliate Claims

As of the filing of this Disclosure Statement, the following claims are held by and owed to "insiders" or "affiliates" of the Debtors, as such terms are defined in section 101 of the Bankruptcy Code:

- Rank Note (as described above): $14,356,293.25 in outstanding principal and $358,907.34 in accrued but unpaid interest, due and owing to LRE as of the Petition Date. As described above, the Rank Note will be paid in accordance with its terms once PEB opens the Resort after reconstruction.

- BHR Notes (as described above): $8,100,000 in outstanding principal and $349,333.34 in accrued but unpaid interest, due and owing to BHR as of the Petition Date. The BHR Notes bear interest at 12% per annum and are due and payable on the earlier of May 23, 2007 and the date on which sufficient insurance proceeds become available to PEB to repay the principal and interest due on the BHR Notes in full. The BHR Notes will be repaid under the Plan after the Effective Date using available cash from operations.

- BHR Bridge Facility (as described above): $11,253,645.90 in outstanding principal and $21,046.42 in accrued but unpaid interest, due and owing to BHR as of the Petition Date. The BHR Bridge Facility includes certain funds extended by BHR to the Debtors postpetition, which would otherwise have been unsecured claims owed to RAC under the RAC Construction Agreement. The BHR Bridge Facility will be repaid under the Plan on the same terms as the RAC Construction Agreement.

- Original RAC Agreement (as described above): $2,924,036.32 due and owing to RAC as of the Petition Date. The RAC Construction Agreement will be assumed under the Plan and amounts previously due under the Original RAC Agreement will be paid as cure costs with respect thereto on the Effective Date.

- BHR Tender Offer Fee: $2,000,000 due and owing to BHR as of the Petition Date with respect to a tender offer made by BHR to the Bondholders on behalf of the Debtors, on or

about April 25, 2006, pursuant to section 4.16 of the Indenture. The BHR Tender Offer Fee will be repaid under the Plan after the Effective Date using available cash from operations.

- LRE Management Fees and Expense Reimbursements: $742,518.83 due and owing to LRE by the Debtors as of the Petition Date with respect to management fees, and other fees and expenses, such as legal fees, consulting fees and employee expense reimbursements paid by LRE on the Debtors' behalf. LRE Management Fees and Expense Reimbursements will be repaid under the Plan after the Effective Date using available cash from operations.

- GAR Management Fees/Membership Rights: $730,334.30 due and owing to GAR, LLC by the Debtors as of the Petition Date with respect to management fees, membership rights and bonuses. Amounts owed in respect of GAR Management Fees and Reimbursement Rights will be repaid under the Plan after the Effective Date using available cash from operations.

- LRE Transferred Claims: $966,693.32 due and owing to LRE by the Debtors as of the Petition Date with respect to the following unsecured third-party claims:

| Transferor | Date of Filing of Notice | Amount of Claim |
|---|---|---|
| • Commercial Millwork Specialists | November 16, 2006 | $166,859.78 |
| • IEP Ltd. d/b/a International Electronic Protection Ltd. | November 27, 2006 | $336,159.87 |
| • The Innovation Group, Inc. | November 14, 2006 | $13,125.00 |
| • Kojis & Sons Signs, Inc. | November 30, 2006 | $37,778.40 |
| • Percipia Networks, Inc. | November 14, 2006 | $4,978.05 |
| • GLORY USA, Inc. | December 7, 2006 | $219,419.64 |
| • Rotolo Consulting, Inc. | January 19, 2007 | $182,307.58 |
| • Cabedge.com, LLC | February 21, 2007 | $6,065.00 |

The LRE Transferred Claims are included as Class 7 General Unsecured PEB Claims.

9.     General Unsecured Claims

In addition to the foregoing, the Debtors estimate additional General Unsecured Claims of approximately $24,580,000. Under the Plan, holders of Allowed General Unsecured Claims will be entitled to receive postpetition interest on such Allowed Claims at the federal judgment rate as of the Petition Date. Holders of Allowed General Unsecured Claims will be entitled to prepetition interest on such claims at the rate provided in the respective contract or agreement to which the Claim relates, if any, in accordance with applicable non-bankruptcy law.

**IV.**

**KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE REORGANIZATION CASES**

**A.     HURRICANE KATRINA**

PEB completed construction of the Resort and received a Temporary Certificate of Occupancy on August 26, 2005. On August 26, 2005, the Ruth's Chris Steak House in the Resort began serving meals and full scale casino and hotel operations were scheduled to commence August 31, 2005. On August 28, 2005 in anticipation of Hurricane Katrina, the Mississippi Gaming Commission ordered

PEB to temporarily cease operations, and the Harrison County Department of Civil Defense ordered mandatory evacuation of the area. On August 29, 2005, Hurricane Katrina destroyed the casino and damaged related facilities, the low-rise building, hotel tower and parking garage.

Although the Debtors believe the ultimate monetary settlement of claims under PEB's insurance policies should be sufficient to reconstruct the Resort similar to its condition immediately preceding Hurricane Katrina, lack of access to the insurance proceeds has impeded the reconstruction process.

## B.  NEGOTIATIONS WITH THE INDENTURE TRUSTEE AND THE BONDHOLDERS AND THE SUBMISSION OF THE COMPREHENSIVE REBUILDING PROPOSAL[8]

As discussed above in Section III.C, after the devastation caused by Hurricane Katrina, PEB asserted substantial loss claims pursuant to their prepetition insurance policies. As a result of several insurance settlements, approximately $160.8 million of insurance proceeds were collected and deposited with U.S. Bank. From this amount, U.S. Bank made interest payments to the Bondholders and funded the payment of various fees and expenses, including fees to legal, financial, and insurance experts retained by the Bondholders, fees and expenses for the Indenture Trustee and the law firm retained by the Indenture Trustee, and expenses associated with maintaining the present condition of the Resort, including certain expenses incurred by the Debtors in their efforts to collect the Insurance Proceeds (defined below). In various capacities, as of January 31, 2007, U.S. Bank held approximately $125,305,492 in restricted bank accounts, including approximately $1,049,392 in an account reserved for payment of the lease between PEB and the State of Mississippi, which allows PEB to build into the Gulf of Mexico on tidelands owned by the State; and $124,256,100 of insurance proceeds from the Insurance Policies (the "Insurance Proceeds") (of which $15,209,933 is held in special accounts by U.S. Bank due to the competing claims of two equipment lenders which had provided financing for equipment destroyed by Hurricane Katrina).

After collection of the Insurance Proceeds, the Debtors requested release of the Insurance Proceeds to rebuild the Resort and repay the vendors who provided goods and services prior to Hurricane Katrina and who assisted with the clean-up and remediation of the site following Hurricane Katrina. The Indenture Trustee, at the direction of the Bondholders, did not allow the Debtors to use the Insurance Proceeds, except for limited purposes. The Indenture Trustee asserted that certain events of default occurred, including an event of default under Section 6.01(o) of the Indenture, by reason of the failure of the Debtors to complete the project by December 31, 2005. The Debtors contest the Indenture Trustee's interpretation of the Indenture and deny that any event of default has occurred because the event of default was excused by impossibility of performance.

The Debtors filed two suits before the United States District Court for the Southern District of Mississippi to contest the declaration of the events of default and the Indenture Trustee's withholding of the Insurance Proceeds. Such litigation has been deferred and is now stayed by virtue of the bankruptcy filings. The Debtors currently intend to dismiss this litigation following consummation of the Plan and final resolution of the Disputed Liquidated Damages Claims by Court order or other court-approved settlement.

The Indenture Trustee and Debtors began working on a plan that would have allowed the Debtors use of the Insurance Proceeds for rebuilding and for payment of payables. On June 29, 2006, the

---

[8] The following recitation of facts is based upon the Debtors' information and belief. The Bondholders and U.S. Bank dispute the recitation of facts below.

Debtors, with the cooperation and collaboration of the Indenture Trustee, submitted a Comprehensive Hurricane Katrina Recovery Proposal (the "Rebuilding Proposal") to the Indenture Trustee. The Debtors detailed in the Rebuilding Proposal the sources and uses of cash and commitments needed (a) to fully reconstruct and have the project operating by no later than December 31, 2007, (b) to settle overdue outstanding obligations that arose both prior and subsequent to Hurricane Katrina, (c) to fund ongoing operations during the construction period, and (d) to fund an 18-month interest reserve from which semi-annual interest payments on the Bonds would be paid. The Rebuilding Proposal also outlined five specific priorities of uses of the Insurance Proceeds anticipated to be received by the Indenture Trustee on or before August 31, 2006, namely: (1) the purchase at 100% of par, plus accrued but unpaid interest through and including the date of purchase, those Bonds tendered under an Event of Loss Offer in accordance with the terms of the Indenture, (2) interest payments on the Bonds through August 1, 2007, (3) the payoff of certain indebtedness owed to equipment financers to the extent that those claims have a priority over the Bonds, (4) costs to reconstruct, repair, and reopen the Resort, and (5) certain other obligations directly relating to the Resort that arose both prior and subsequent to Hurricane Katrina and were not otherwise prohibited under the Indenture.

Under the terms of the Rebuilding Proposal, the Debtors formally requested that the Indenture Trustee (in the absence of direction from a majority of the bondholders) exercise its discretion to allow the Debtors to use available Insurance Proceeds to repair, rebuild, and reopen the Resort and pay certain claims, including payables that relate to the original building of the facility and to remediation and clean-up after Hurricane Katrina. The Indenture Trustee supported the Rebuilding Proposal and on June 30, 2006, the Indenture Trustee filed a petition (the "Petition to Approve the Rebuilding Proposal") with the State of Minnesota District Court, Second Judicial District, Ramsey County, seeking to authorize the Indenture Trustee to take all actions reasonable or necessary to consummate the Rebuilding Proposal. Therein, the Indenture Trustee expressly acknowledged that:

(i)    it has the discretion to waive conditions to disbursement requests, including the failure to certify the completion of the Resort by December 31, 2005;

(ii)   the Rebuilding Proposal appears to be fair and protects the Bondholders' interests by giving them essentially the same investment they bargained for prior to Hurricane Katrina;

(iii)  the Resort in its present condition produces no income and the losses can only be stopped by accelerating the indebtedness and selling the damaged Resort or by repairing and reconstructing the Resort so that it may generate income; and

(iv)   the Rebuilding Proposal is an appropriate use of its discretion.

Approximately one week before the hearing on the Petition to Approve the Rebuilding Proposal, Pacific Investment Management Company LLC, Deutsche Asset Management, Western Asset Management, and Lord Abbett & Co., holders and/or managers on behalf of managed funds and accounts of a purported majority in principal of the Bonds (the "Majority Bondholders") requested that the Indenture Trustee delay the hearing on the Petition. Soon thereafter, based upon objections by the Majority Bondholders, the Indenture Trustee advised PEB that it would not proceed with the prosecution of the Petition to Approve the Rebuilding Proposal.

Prior to the Petition Date, all material efforts toward reconstruction were funded directly or indirectly by BHR or Leucadia. Since the Petition Date, the Debtors have been able to access cash collateral to fund reconstruction.

C.      **INSURANCE DISPUTE**[9]

        The availability and prospective cost of insurance has remained a point of contention
between the Debtors and the Bondholders.  With an effective date of July 21, 2006, PEB obtained $149.3
million in insurance coverage for damage to real and personal property and up to six months or $30
million of business interruption and delayed opening coverage, with a $50,000,000.00 cap for
catastrophic events (hurricanes).  The existing coverage limits remain in effect through the renewal date
of July 21, 2007.  At the time PEB placed the current years insurance program, the casino portion of the
Resort had been totally destroyed and the remaining portions of the Resort were substantially damaged
and unrepaired from the effects of Hurricane Katrina.

        Prior to the Petition Date, as part of the negotiation for the use of the Insurance Proceeds,
the Bondholders demanded either a change to the Indenture or some other contractual undertaking
committing PEB to procure, obtain and maintain insurance of certain guaranteed minimum amounts.
Given the uncertainty of the insurance market, post-Hurricane Katrina, PEB could not, and believes it still
cannot, agree to such unilateral changes because the insurance market is still volatile, and PEB does not
want to be in the position of creating a potential event of default pursuant to the Indenture.

        The existing Indenture does not require PEB to maintain any fixed dollar minimum levels
of insurance coverage.  The lack of potential availability of insurance coverage was completely set forth
in the original offering circular upon which the Bonds were purchased provided that:

> **WE MAY NOT BE ABLE TO OBTAIN SUFFICIENT
> INSURANCE COVERAGE TO REPLACE OR COVER THE
> FULL VALUE OF THE COLLATERAL.**
>
> The terrorist attacks of September 11, 2001, and the damage caused by
> adverse weather conditions have substantially affected the availability of
> insurance coverage for certain types of damages or occurrences.  While
> we have obtained insurance coverage with respect to the occurrences of
> casualty damage to cover any losses that could result from these events
> for the construction period, we may not be able to obtain sufficient or
> similar insurance for later periods.  The lack of sufficient types of
> insurance for these types of acts and casualty losses could expose us to
> heavy losses in the event that any damages occur, directly or indirectly,
> as a result of casualty losses.  In the event that we do not have sufficient
> insurance coverage to insure against damage caused by weather related
> casualty losses, the collateral securing the notes, after certain events of
> loss, may be insufficient to cover the amount due on the notes.  We also
> intend to obtain business interruption insurance.  While such insurance
> may provide some overage for losses we may incur, we cannot assure
> you that such insurance will be available or that the proceeds from any
> claim will be sufficient to adequately compensate us.

        PEB is presently in the market through its co-brokers of record, SawyerFoster and
Integro,[10] to determine availability, capacity, and potential costs for property coverage, including

---

[9] The following recitation of facts is based upon the Debtors' information and belief.  The Bondholders and U.S.
Bank dispute the recitation of facts below.

catastrophic coverage, for the July 2007 - July 2008 policy year. SawyerFoster possesses extensive knowledge of the Resort, having provided the catastrophic coverage for the property during the 2005 and 2006 hurricane seasons. Integro is a U.S.-based insurance brokerage firm with offices in the major international insurance centers of London and Bermuda, bringing the requisite knowledge, access, and familiarity of these markets to the Debtors' insurance process. Additionally, Integro will also utilize Swett & Crawford, a wholesale brokerage firm with an extensive background in placing coverage for wind-exposed insureds in the Gulf area. PEB believes that its co-brokers will place PEB in the best position to acquire optimal insurance coverage. PEB hopes to have more concrete information regarding availability of and potential costs for its prospective insurance in the near future and intends to file a report outlining same with the Bankruptcy Court on or before March 20, 2007. PEB intends to obtain as much insurance as is reasonable, necessary and available, depending on a variety of factors, including, but not limited to, PEB's risk assessment and the prospective cost of such coverage.

For the current policy year (July 2006 - July 2007), the Debtors believe that, given the risk of loss associated with the new value of construction added to the property since Hurricane Katrina, the present level of insurance coverage is more than adequate. The Debtors further believe that insurance at the levels previously requested by the Bondholders for the current policy year was unnecessary and cost-prohibitive.

Finally, upon confirmation of the Debtors' Plan, the Bondholders' claims will be satisfied and the Bondholders and U.S. Bank will no longer have an insurable interest in the Resort collateral. Future insurance disputes will no longer be an issue to the Bondholders, the Indenture Trustee and trade creditors, which will all be paid pursuant to the Plan. After confirmation, the parties with a remaining material interest in the availability and cost of prospective insurance coverage will be PEB, its exit lender, BHR, and PEB's equity holders.

**V.**

**THE REORGANIZATION CASES**

**A.    FIRST DAY ORDERS**

On September 19, 2006 (the "Commencement Date"), PEB and Premier Finance filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code, before the Bankruptcy Court (Case Nos. 06-50975 (ERG) and 06-50976 (ERG)).

The Debtors have continued to operate their business as debtors in possession under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.

On the Commencement Date, the Debtors filed motions seeking various relief from the Bankruptcy Court to minimize disruption of business operations and to facilitate their reorganization.

1.    On September 20, 2006, the Bankruptcy Court issued orders authorizing: (i) the joint administration of the chapter 11 cases and (ii) the retention of the Debtors' legal and financial advisors.

---

[10] Leucadia directly or indirectly holds approximately 10% of the preferred equity in Integro. Leucadia has no control over the operations of Integro, nor do the two entities have any common directors. Integro is not an Affiliate of the Debtors or Leucadia.

2.     On September 20, 2006, the Bankruptcy Court issued an Order in Aid of Sections 363, 364 and 1108 Authorizing Debtor to Operate Business, thereby authorizing the Debtors to:

- employ, discharge, fix and pay the compensation, salaries, and wages of all managers, agents, employees and servants as it deems necessary for the proper operation of its business and the preservation of the Debtor's property;

- buy and sell merchandise, supplies and other properties and services necessary to the operation of its business, and to purchase and sell for cash or credit;

- enter into any contracts incidental to the normal and usual operation of the business and the management and preservation of the Debtor's property;

- obtain insurance on the property and against personal liability of the Debtor as it deems advisable, and to pay premiums therefore;

- maintain and open such banking and checking accounts as Debtor deems advisable for the operation of the business, and to make deposits and withdrawals therefrom in the ordinary course of business, in compliance with requirements and guidelines of the Office of the United States Trustee;

- collect and receive all accounts, rents, issues, income, profits, credits and things in action due or to become due to the Debtor;

- close the Debtor's books of account at the close of business on the business day preceding the order for relief and to open and maintain new books of account;

- inform its employees, suppliers, customers or all others who shall extend credit that their claims will have priority over debts incurred before the filing of the petition herein, as contemplated by section 503(b)(1) of the Bankruptcy Code;

- draw checks on corporate accounts in the ordinary course of business without the countersignature of the clerk or the Bankruptcy Judge; and

- pay all taxes arising out of the Debtor's role as an employer, and to file all returns required by section 6011 of the Internal Revenue Code, commonly called Employer's Quarterly Tax Returns and all other tax returns required by law.

## B.     CHAPTER 11 FINANCING

1.     <u>Cash Collateral</u>

On the Commencement Date, the Debtors also filed their Motion Pursuant to Section 363(c) of the Bankruptcy Code and Bankruptcy Rule 4001(b) for Order Authorizing the Use of Cash Collateral on an Interim and Final Basis (the "Cash Collateral Motion"), whereby they sought use of the Insurance Proceeds as cash collateral pursuant to section 363 of the Bankruptcy Code.

The Indenture Trustee and the Majority Bondholders each filed separate objections to the Cash Collateral Motion

On October 3 and 4, 2006, the Bankruptcy Court held an evidentiary interim hearing (the "Cash Collateral Hearing") on the Cash Collateral Motion.  On October 10, 2006, the Court entered its

interim order granting the Debtors' use of cash collateral and an accompanying opinion granting the Cash Collateral Motion on an interim basis. On October 23, 2006, the Court entered an Order in Furtherance of Interim Order on Debtors' Motion for Use of Cash Collateral, which reflected certain agreements of the parties with respect to the interim use of cash collateral, including the disbursement request process and certain fees payable to U.S. Bank and its counsel. The use of the cash collateral has since been extended through April 13, 2007 based on these terms.

      2.      <u>The DIP Motion</u>

On October 9, 2006, the Debtors filed their motion for approval of postpetition financing sufficient to (i) pay off the Bonds, (ii) establish an escrow to satisfy any claims by the Bondholders with respect to the repayment of the Bonds (see discussion below regarding the Disputed Liquidated Damages Escrow) and (iii) reconstruct and reopen the Resort.

The Majority Bondholders and the Indenture Trustee each objected to the DIP Motion. The Majority Bondholders and the Indenture Trustee disputed the Debtors' right to pay off the Bonds and extinguish the Bondholders' liens pursuant to Section 364 of the Bankruptcy Code. The Majority Bondholders and the Indenture Trustee also disputed the necessity of the DIP Facility and the benefits thereof. By order entered February 2, 2007, the Bankruptcy Court denied the DIP Motion, holding that the Debtors could not prepay the Bonds prior to confirmation over the objections of the Bondholders and the Indenture Trustee.

      3.      <u>Proposed Exit Financing</u>

Although the DIP Motion was denied, the Debtors proposed to enter into a credit facility with BHR upon consummation of the Plan on substantially the same terms and conditions as would have existed under the DIP Facility.

The significant elements of the Exit Facility are as follows:

**Amount and Type of Facility:** A credit facility made available to the Borrowers in a principal amount of up to $180 million (as defined above, the "Exit Facility"). All loans outstanding under the Exit Facility (the "Loans") shall become due and payable on the Maturity Date (as defined below).

**Term:** The period from the Closing Date to the earlier of (i) February 1, 2012 or (ii) acceleration of the Loans due to an event of default (the "Maturity Date").

**Non-Default Interest Rate:** 10¾% per annum.

**Default Interest Rate:** During the continuance of an event of default, Loans will bear interest at an additional 1.0% per annum.

**Loan Payments:** Semi-annual interest payments payable on February 1st and August 1st. Payment in full is due on the Maturity Date.

**Prepayment:** Borrowers will be entitled to prepay the Loans in part or in full at any time and from time to time without penalty.

**Use of Proceeds:** Proceeds of the Loans under the Exit Facility will be used to (i) repay principal, plus accrued interest then owing on the Bonds; (ii) fund the Disputed Liquidated Damages Escrow (as defined below); (iii) fund the implementation of the Plan

and distributions to creditors; (iv) pay for the postpetition operating expenses of the Borrowers incurred in the ordinary course of their business, including the repair, reconstruction, and eventual operation of the Resort, (v) certain other costs and expenses of administration of the bankruptcy cases as will be specified, and (vi) other expenses to the Borrowers, as approved by the Bankruptcy Court if applicable, and consented to by BHR.

**Security:** A first priority perfected security interest in and lien on all assets of the Borrowers, except as provided in the Plan, the Confirmation Order, or the Loan Documents.

4.     The Disputed Liquidated Damages Escrow[11]

The Bondholders have stated in pleadings filed with the Bankruptcy Court that they are not amenable to repayment of the Bonds at par. Rather, the Bondholders have indicated they believe they are entitled to damages if the Debtors repay the Bonds before February 1, 2008. The Debtors intend to use a portion of the Loans to deposit with U.S. Bank additional funds to equal the sum of (a) all principal, plus accrued but unpaid interest on the Bonds through and including the date of payoff (the "Payoff"),[12] (b) $10.75 million (the "Disputed Liquidated Damages Amount") (the maximum damages provided in Section 6.02 of the Indenture if the Bonds are repaid prior to February 1, 2008), plus (c) a reserve to cover the sum of (i) its accrued and unpaid Indenture Trustee Fees and (ii) a $1,000,000 reserve for anticipated future Indenture Trustee Fees.[13] Promptly following the date of the closing of the Exit Facility (the "Exit Facility Closing Date"), the Indenture Trustee will distribute the Payoff to the Bondholders. The Payoff by the Debtors will release the Insurance Proceeds, as the Bondholders' liens thereon will be extinguished.[14] The Disputed Liquidated Damages Escrow will be held in an account (i) in the name of U.S. Bank (for the benefit of the Bondholders), (ii) maintained at U.S. Bank, (iii) which account shall earn interest at a rate equal to the ninety day certificate of deposit rate as announced by U.S. Bank from time to time, and which interest shall be credited thereto and held therein as part thereof,[15] (iv) which account shall be maintained by U.S. Bank for the payment of additional claims by the Bondholders and

---

[11] The following recitation of facts is based upon the Debtors' information and belief. The Bondholders and U.S. Bank dispute the recitation of facts below.

[12] No funds held by U.S. Bank as Indenture Trustee, Disbursement Agent or in any other capacity in any escrow arrangement regarding the claims of The Peoples Bank or IGT Technology shall be counted for purposes of the required payment by Debtors to U.S. Bank on the Closing Date.

[13] To the extent future Indenture Trustee Fees are greater than the $1,000,000 reserved therefor, the Debtors have been advised that the Indenture Trustee intends to assert a charging lien pursuant to Section 7.07 of the Indenture, allowing it to pay its Indenture Trustee Fees from any distribution to the holders of Allowed Secured Bond Claims.

[14] To the extent escrows have been maintained for the payment of specific claims, then the Debtors intend to maintain such escrow arrangements pending confirmation of a plan or further Court order.

[15] The prevailing party in the litigation with respect to the Disputed Liquidated Damages Claims shall be entitled to accrued interest earned on funds held in the Disputed Liquidated Damages Escrow. Any amounts remaining in the Disputed Liquidated Damages Escrow to which the holders of Allowed PEB Secured Bond Claims and Premier Finance Secured Bond Claims are not entitled (after deduction of fees and expenses of the account, including taxes) will revert to the Reorganized Debtors.

the Indenture Trustee under the Indenture, if any, relating to prepayment of the Bonds or any other form of damages thereunder (the "Disputed Liquidated Damages Claims"), pending resolution of the Disputed Liquidated Damages Claims by Final Order, including a court-approved settlement, and (v) to which the Indenture Trustee and the Bondholders would be granted first priority liens and security interests pending resolution of the Disputed Liquidated Damages Claims.

## C.   HARD ROCK ASSUMPTION MOTION

On October 12, 2006, PEB filed a motion to assume (the "Hard Rock Assumption Motion") the following agreements: (i) that certain Hard Rock License Agreement dated May 15, 2003, as amended (the "Hard Rock License Agreement"), by and between PEB and Hard Rock Hotel Licensing, Inc., (ii) that certain Hard Rock Café Lease Agreement dated December 30, 2003, as amended (the "Café Lease Agreement"), by and between PEB and Hard Rock Café International (STP), Inc. ("Hard Rock International," and collectively with Hard Rock Licensing, "Hard Rock"), and (iii) that certain Hard Rock Retail Store Lease Agreement, by and between PEB and Hard Rock International, dated December 30, 2003, as amended (the "Retail Store Lease Agreement," and collectively with the Café Lease Agreement, the "Hard Rock Lease Agreements," and the Lease Agreements collectively with the License Agreement, the "Hard Rock Agreements").

The cornerstone of the Resort is the Hard Rock brand.  Pursuant to the Hard Rock License Agreement, Hard Rock Licensing granted PEB an exclusive right and license to design, develop, operate, own, and manage the Resort using and displaying various "Hard Rock" trademarks and other license rights.  PEB entered into the Hard Rock License Agreement in contemplation of executing, *inter alia*, the Hard Rock Lease Agreements.  Under the Café Lease Agreement, PEB granted Hard Rock International a right to lease from PEB a portion of the Resort in a prominent location on the main floor lobby of the Hotel and have access to the Hotel lobby and exterior of the Hotel (the "Premises") together will all rights and appurtenances thereunto as provided in the Café Lease Agreement.  Under the Retail Store Lease Agreement, PEB granted Hard Rock International the right to operate a retail store for the sale, among various sundries, of "Hard Rock" branded merchandise on the Premises of the Resort.

On November 21, 2006, the Court approved the Hard Rock Assumption Motion whereby the Debtors assumed the Hard Rock Agreements.  PEB is indebted to Hard Rock Hotel Licensing, Inc. under the Hard Rock License Agreement in the amount of $2,202,922.37 for amounts due and owing prior to the Petition Date.  Such amounts are not included in the Debtors' estimate of Class 7 General Unsecured PEB Claims, but rather will be paid pursuant to the terms of the Hard Rock Agreements. Additionally, to date, PEB has accrued $600,000 is postpetition royalties to Hard Rock Licensing, Inc. Postpetition royalties are due and payable within six months after commencement of Resort operations.

## D.   CREDITORS' COMMITTEE

On November 16, 2006, the U.S. Trustee, pursuant to its authority under section 1102 of the Bankruptcy Code, appointed an official committee of unsecured creditors (the "Creditors' Committee").

The current members of the Creditors' Committee are:

Associated Food Equipment & Supplies
Steve Horlock
10381 Express Drive
Gulfport, MS 39505

BellSouth Telecommunications, Incorporated
Reginald A. Greene
Suite 4300
675 West Peachtree Street
Atlanta, GA 30375

International Game Technology
Gent K. Culver
9295 Prototype Drive
Reno, NV 89521

By application dated October 26, 2006 and amended on November 9, 2006, the Creditors' Committee has sought to hire Locke Liddell & Sapp LLP as their attorneys. On November 28, 2006, the Bankruptcy Court granted such application.

Since the appointment of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the chapter 11 cases and have informed the Creditors' Committee with respect to their operations.

## E.   THE SCHEDULES AND BAR DATE

On September 19, 2006, the Debtors filed their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statement of financial affairs. On October 20, 2006, the Debtors amended their schedules. On September 25, 2006, the Bankruptcy Court entered an order establishing December 26, 2006 as the last date and time (the "Bar Date") for each person or entity to file proofs of Claim based on prepetition Claims against any of the Debtors, and March 18, 2007 as the last time and date for governmental entities to file proofs of Claim based upon prepetition Claims against any of the Debtors.

## F.   REJECTION AND ABANDONMENT OF CERTAIN PROPERTY

The Debtors are not seeking to reject or abandon any property at this time, but reserve the right to amend this decision prior to confirmation of the Plan.

### VI.

### THE PLAN OF REORGANIZATION

## A.   INTRODUCTION

The Debtors believe that (i) because holders of Allowed Claims will receive a 100% recovery under the Plan, creditors will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and (ii) the Plan will afford the Debtors the opportunity and ability to continue in business as a viable going concern and preserve ongoing employment for the Debtors' employees.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

**B.     CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF REORGANIZATION**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable, payment in full, in cash, with postpetition interest to the extent appropriate and provided for under the governing agreement (or if there is no agreement, under applicable nonbankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced. Under the Debtors' Plan, the Claims in Classes 4 (Peoples Bank Secured Claim), 5 (Secured PEB Bond Claims), 6 (Secured Premier Finance Bond Claims), 7 (General Unsecured PEB Claims), 8 (General Unsecured

Premier Finance Claims) and 10 (Affiliate Claims) are impaired, and therefore, the holders of such Claims are entitled to vote to accept or reject the Plan.

Pursuant to 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the Claims and Equity Interests in Classes 1 (Other Priority Claims), 2 (Secured Tax Claims), 3 (Other Secured Claims), 9 (Rank Note Claim), 11 (PEB Equity Interests) and 12 (Premier Finance Equity Interests), are unimpaired, and therefore, the holders of such Claims and Equity Interests are "conclusively presumed" to have voted to accept the Plan.

For a more detailed description of the requirements for confirmation, see Section IX below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION -- Requirements for Confirmation of the Plan of Reorganization."

Consistent with these requirements, the Plan divides the Allowed Claims against, and Allowed Equity Interests in, the Debtors into the following Classes:

| Class | Claims |
|---|---|
| 1 | Other Priority Claims |
| 2 | Secured Tax Claims |
| 3 | Other Secured Claims |
| 4 | Peoples Bank Secured Claim |
| 5 | Secured PEB Bond Claims |
| 6 | Secured Premier Finance Bond Claims |
| 7 | General Unsecured PEB Claims |
| 8 | General Unsecured Premier Finance Claims |
| 9 | Rank Note Claim |
| 10 | Affiliate Claims |
| 11 | PEB Equity Interests |
| 12 | Premier Finance Equity Interests |

1.      Unclassified

**Administrative Expense Claims**

Administrative Expense Claims are the actual and necessary costs and expenses of the Debtors' Reorganization Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors in Possession during the Reorganization Cases, compensation for professional services rendered and reimbursement of expenses incurred and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors will be paid in full and performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

**Professional Compensation and Reimbursement Claims**

Professional Compensation and Reimbursement Claims are all Claims of entities seeking compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code. All such entities must file, on or before the date that is forty-five (45) days after the Effective Date their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred.

Pursuant to the Plan, holders of Allowed Professional Compensation and Reimbursement Claims will be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

**Priority Tax Claims**

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive on the Effective Date, Cash in an amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations become due.

2.    Classified

**Class 1 – Other Priority Claims**

Other Priority Claims include certain claims that are granted priority in payment under section a Claim entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, including certain wage, salary and other compensation obligations to employees of the Debtors up to a statutory cap of $10,000 per employee. The Debtors estimate that on the Effective Date, the allowed amount of such claims will aggregate approximately $0.

Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim agrees to a different treatment, each holder of an Allowed Other Priority Claim will receive Cash in an amount equal to such Allowed Other Priority Claim on the later of the Effective Date and the date such Allowed Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable.

**Class 2 – Secured Tax Claims**

Secured Tax Claims include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under sections 502(i) and 507(a)(8) of the Bankruptcy Code. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 2 is unimpaired by the Plan. Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim will receive, at the sole option of the Debtors or the Reorganized Debtors, (i) Cash in an amount equal to such Allowed Secured Tax Claim or (ii) commencing on the Effective Date and continuing over a period not exceeding five years from and after the Commencement Date, equal semiannual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim, and in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.

### Class 3 – Other Secured Claims

Other Secured Claims include any Secured Claim other than a Secured Tax Claim or a Secured Bond Claim. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $720,000.

Class 3 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (i) on the Effective Date or as soon thereafter as is practicable, each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

### Class 4 – Peoples Bank Secured Claim

The Peoples Bank Secured Claim includes the Claim held by Peoples Bank against PEB with respect to the Peoples Bank Loan. The Debtors estimate that on the Effective Date, the Allowed amount of such Claim will aggregate approximately $1,301,042.

Class 4 is impaired by the Plan. The holder of the Peoples Bank Secured Claim is entitled to accept or reject the Plan.

Except to the extent that the holder of the Peoples Bank Secured Claim agrees to different treatment, the holder of the Peoples Bank Secured Claim shall receive the principal amount of the Peoples

Bank Loan on the Effective Date, plus accrued interest thereon at a 7% rate of interest per annum, in Cash on the Effective Date.

### Class 5 – Secured PEB Bond Claims

Secured PEB Bond Claims will include any Claim by a Bondholder against PEB arising under or related to the Indenture. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $160,000,000, plus accrued interest through the Effective Date, which the Debtors estimate will be approximately $4,300,000. Notwithstanding anything to the contrary herein, Holders of Allowed Class 5 Claims and Allowed Class 6 Claims are only entitled to one recovery.

Class 5 is impaired by the Plan. Each holder of a Secured PEB Bond Claim is entitled to vote to accept or reject the Plan.

Each holder of an Allowed Secured PEB Bond Claim shall be paid in full[16] as follows: each holder of an Allowed Secured PEB Bond Claim shall receive its Ratable Proportion of (i) any principal amount of the Bonds outstanding on the Effective Date, plus accrued interest thereon through the Effective Date, in Cash on the Effective Date, and (ii) the amount, if any, of the Disputed Liquidated Damages Escrow to which Bondholders as of the Distribution Record Date are entitled, in Cash solely from the Disputed Liquidated Damages Escrow, promptly after resolution of the Disputed Liquidated Damages Claims by Final Order, including a court-approved settlement. All unpaid Indenture Trustee Fees will be paid in Cash on the Effective Date by the Reorganized Debtors. The Bankruptcy Court shall resolve any dispute regarding the reasonableness of the Indenture Trustee Fees.

### Class 6 – Secured Premier Finance Bond Claims

Secured Premier Finance Bond Claims will include any Claim by a Bondholder against Premier Finance arising under or related to the Indenture. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $160,000,000, which the Debtors estimate will be approximately $4,300,000. Notwithstanding anything to the contrary herein, Holders of Allowed Class 5 Claims and Allowed Class 6 Claims are only entitled to one recovery.

Class 6 is impaired by the Plan. Each holder of a Secured Premier Finance Bond Claim is entitled to vote to accept or reject the Plan.

Each holder of an Allowed Secured Premier Finance Bond Claim shall be paid in full[17] as follows: each holder of an Allowed Secured Premier Finance Bond Claim shall receive its Ratable Proportion of (i) any principal amount of the Bonds outstanding on the Effective Date, plus accrued interest thereon through the Effective Date, in Cash on the Effective Date, and (ii) the amount, if any, of the Disputed Liquidated Damages Escrow to which Bondholders as of the Distribution Record Date are entitled, in Cash solely from the Disputed Liquidated Damages Escrow, promptly after resolution of the Disputed Liquidated Damages Claims by Final Order, including a court-approved settlement. All unpaid

---

[16] The Bondholders and U.S. Bank dispute that the payment terms proposed by the Debtors constitute payment in full.

[17] The Bondholders and U.S. Bank dispute that the payment terms proposed by the Debtors constitute payment in full.

Indenture Trustee Fees will be paid in Cash on the Effective Date by the Reorganized Debtors. The Bankruptcy Court shall resolve any dispute regarding the reasonableness of the Indenture Trustee Fees.

### Class 7 – General Unsecured PEB Claims

General Unsecured PEB Claims include any Claim, including postpetition interest at the federal judgment rate as of the Petition Date, against PEB other than an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Tax Claim, an Other Secured Claim or a Secured Bond Claim. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $36,554,078.

Class 7 is impaired by the Plan. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed General Unsecured PEB Claim agrees to a different treatment, each holder of an Allowed General Unsecured PEB Claim shall receive Cash in an amount equal to fifty percent (50%) of its Allowed General Unsecured PEB Claim on the Effective Date, and the remaining fifty percent (50%) within sixty (60) days thereafter, or as soon as practicable after the Allowed General Unsecured Claim becomes an Allowed General Unsecured Claim. All Allowed General Unsecured PEB Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations come due.

### Class 8 – General Unsecured Premier Finance Claims

General Unsecured Premier Finance Claims include any Claim, including postpetition interest at the federal judgment rate as of the Petition Date, against Premier Finance other than an Administrative Expense Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Tax Claim, an Other Secured Claim or a Secured Bond Claim. **The Debtors do not believe any General Unsecured Premier Finance Claims exist.**

Class 8 is impaired by the Plan. Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed General Unsecured Premier Finance Claim agrees to a different treatment, each holder of an Allowed General Unsecured Premier Finance Claim shall receive Cash in an amount equal to fifty percent (50%) of its Allowed General Unsecured Premier Finance Claim on the Effective Date, and the remaining fifty percent (50%) within sixty (60) days thereafter, or as soon as practicable after the Allowed General Unsecured Claim becomes an Allowed General Unsecured Claim. All Allowed General Unsecured Premier Finance Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as such obligations come due.

### Class 9 – Rank Note Claim

The Rank Note Claim includes the Claim held by LRE against PEB with respect to the Rank Note.

Class 9 is unimpaired by the Plan as the Rank Note shall be reinstated under the Plan. The holder of the Rank Note Claim shall not be entitled to vote to accept or reject the Plan.

### Class 10 – Affiliate Claims

All Affiliate Claims are held by insiders of the Debtors.  Affiliate Claims include (i) the Claim against PEB held by BHR with respect to the $2 million tender offer made by BHR on behalf of the Debtors on or about April 25, 2006; (ii) the Claim against PEB held by LRE, in the approximate amount of $742,518.83 with respect to management fees and other fees advanced by LRE on behalf of PEB; (iii) the Claim against PEB held by GAR, in the approximate amount of $730,334.30 with respect to management fees, membership rights and bonuses due and owing to GAR; and (iv) the Claim against PEB held by BHR with respect to the BHR Notes.  The Debtors estimate that the Allowed amounts of such Claims will aggregate approximately $11,922,000 to be paid post-Effective Date.

Class 10 is impaired by the Plan.  Each holder of an Affiliate Claim is entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Affiliate Claim agrees to different treatment, each holder of an Allowed Affiliate Claim shall be paid out of Available Cash post-Effective Date.

### Class 11 – PEB Equity Interests

PEB Equity Interests include Equity Interests in the Debtors as they existed on or immediately prior to the Effective Date.

Class 11 is unimpaired by the Plan.  Each holder of a PEB Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

The PEB Equity Interests will be unaltered.

### Class 12 – Premier Finance Equity Interests

Premier Finance Equity Interests include Equity Interests in the Debtors as they existed on or immediately prior to the Effective Date.

Class 12 is unimpaired by the Plan.  Each holder of a Premier Finance Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

The Premier Finance Equity Interests will be unaltered.

## C.   MEANS OF IMPLEMENTING THE PLAN

### 1.   Settlement of Claims

Pursuant to Bankruptcy Rule 9019, the Plan, including the classification, distribution and other benefits provided thereunder, constitutes a good-faith compromise and settlement of all Claims or controversies resolved pursuant to the Plan.

### 2.   Cancellation of Existing Securities and Agreements

Except (i) as otherwise expressly provided in the Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by the Debtors, or (iii) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Indenture and all notes and debentures issued thereunder, and other instruments evidencing any Claims against the Debtors

or Equity Interests will be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder will be discharged, and none of the Debtors or Reorganized Debtors will thereafter be liable in any way for any amounts in connection therewith.

Notwithstanding anything to the contrary in the Plan, the Indenture shall remain in effect following the Effective Date solely with respect to: (i) the rights of the Indenture Trustee as between it and the holders of Allowed Secured Bond Claims as of the Distribution Record Date relating to the Disputed Liquidated Damages Escrow; and (ii) the rights of the Indenture Trustee relating to distributions to be made to the holders of the Allowed Secured Bond Claims as of the Distribution Record Date in accordance with the terms of the Plan. The Debtors reserve the right to address the reasonableness and necessity of all post-Effective Date fees and expenses incurred by the Indenture Trustee.

      3.      <u>Surrender of Existing Securities</u>

Each holder of the Bonds will surrender its note(s) to the Indenture Trustee, or in the event such note(s) are held in the name of, or by a nominee of, the Depository Trust Company, Reorganized PEB will seek the cooperation of the Depository Trust Company to provide appropriate instructions to the Indenture Trustee. No distributions under the Plan will be made for or on behalf of any such holder unless and until such note is received by the Indenture Trustee or appropriate instructions from the Depository Trust Company will be received by the Indenture Trustee, or the loss, theft or destruction of such note is established to the reasonable satisfaction of the Indenture Trustee, which satisfaction may require such holder to submit (a) a lost instrument affidavit and (b) an indemnity bond holding the Debtors, Reorganized Debtors and Indenture Trustee harmless in respect of such note and any distributions made in respect thereof. Upon compliance with this Section by a holder of any note, such holder will, for all purposes under the Plan, be deemed to have surrendered such note. Any holder of the Bonds that fails to surrender such note or satisfactorily explain its non-availability to the Indenture Trustee within two (2) years of the Effective Date will be deemed to have no further Claim against the Debtors and the Reorganized Debtors (or their property) or the Indenture Trustee in respect of such Claim and will not participate in any distribution under the Plan. All property in respect of such forfeited distributions, including interest thereon, will be promptly returned to the applicable Reorganized Debtor by the Indenture Trustee.

      4.      <u>Incurrence of New Indebtedness</u>

The Debtors believe that funding from the Exit Facility Lenders under the Exit Facility will enable the Debtors to make the distributions and payments required under the Plan on the Effective Date, as well as provide post-confirmation liquidity for the Reorganization Debtors until operations commence. The Reorganized Debtors' entry into the Exit Financing Agreement and the incurrence of the indebtedness thereunder on the Effective Date will be authorized by the Plan and Confirmation Order without the need for any further corporate action and without any further action and without any further action by holders of Claims or Equity Interests.

## D.      DISPUTED LIQUIDATED DAMAGES ESCROW

As discussed above, the Plan provides an escrow for the Disputed Liquidated Damages Claims, namely, the Disputed Liquidated Damages Escrow, such that the Bankruptcy Court can resolve the Disputed Liquidated Damages Claims in due course, including post-confirmation, if necessary, while the Resort is being rebuilt and opened for business.

E.    **PLAN PROVISIONS GOVERNING DISTRIBUTION**

     1.    <u>Distribution on Account of Allowed Claims</u>

          Distributions in respect of Allowed Claims shall be made on the later of the date provided in Article IV of the Plan and the date a Claim becomes Allowed. For purposes of treatment and Distribution under the Plan, all Allowed General Unsecured Claims held by a creditor will be aggregated and treated as a single Claim. At the written request of the Reorganized Debtors, any creditor holding multiple Allowed General Unsecured Claims will provide to the Reorganized Debtors, as the case may be, a single address to which any Distributions shall be sent.

     2.    <u>Delivery of Distributions</u>

          (a)    Except as otherwise provided herein, all distributions under the Plan will be made by Reorganized PEB. Reorganized PEB will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Reorganized PEB will be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities and (d) exercise such other powers as necessary and proper to implement the provisions hereof.

          (b)    Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim or Allowed Administrative Expense Claim will be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or its agents, as applicable, unless the Debtors or Reorganized Debtors have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim by such holder that contains an address for such holder different than the address of such holder as set forth on the Schedules. In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors will use commercially reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Reorganized Debtors has determined the then-current address of such holder, at which time such distribution will be made to such holder without interest; provided that such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interest in property will be returned by the Reorganized Debtors and will revert to Reorganized PEB, and the Claim of any other holder to such property or interest in property will be discharged and forever barred.

          (c)    The Indenture Trustee will distribute funds received by it for the benefit of holders of Secured Bond Claims to such holders. Distributions under the Plan to holders of Allowed Secured Bond Claims will be made by the Reorganized Debtors to the Indenture Trustee, which, in turn, will make the distributions to the holders of such Allowed Claims. Upon delivery of the distributions set forth in Article IV of the Plan to the Indenture Trustee and the funding of the Disputed Liquidated Damages Escrow, the Reorganized Debtors will be released of all liability with respect to the delivery of such distributions.

          (d)    (i)    Pursuant to the Plan, the Debtors will transfer the Disputed Liquidated Damages Amount in Cash to the Disputed Liquidated Damages Escrow, to be held in a segregated account maintained by U.S. Bank for the benefit of the holders of Allowed PEB Secured Bond Claims and Premier Finance Secured Bond Claims. Any amounts remaining in the Disputed Liquidated Damages Escrow to which the holders of Allowed PEB Secured Bond Claims and Premier Finance Secured Bond Claims are not entitled (after deduction of fees and expenses of the account, including taxes) will revert to the Reorganized Debtors.

(ii)     Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, U.S. Bank will (a) treat the escrow established under Section 6.4(d) of the Plan as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently for state and local income tax purposes.  All parties (including the Debtors, Reorganized Debtors and holders of PEB Secured Bond Claims and Premier Finance Secured Bond Claims) will report for tax purposes consistently with such treatment.

(iii)     U.S. Bank may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the escrow established under section 6.4(d) of the Plan for all taxable periods through the termination of such escrow.

(e)     With respect to holders of all Claims against the Debtors, other than holders of the Secured Bond Claims, the claims register will be closed on the Distribution Record Date.  The Debtors and the Reorganized Debtors will have no obligation to recognize any transfer of any Claims occurring after the close of business after such date.  Notwithstanding the foregoing, the Distribution Record Date shall be used as the record date for distributions, if any, from the Disputed Liquidated Damages Escrow to holders of Allowed Secured Bond Claims in accordance with sections 4.5 and 4.6 of the Plan.

3.     Manner of Payment

At the option of the Reorganized Debtors, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

All distributions of Cash to the creditors of each of the Debtors under the Plan will be made by, or on behalf of, the applicable Debtor.

4.     Setoff and Recoupment

The Debtors may, but will not be required to, setoff against or recoup from any Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors or Reorganized Debtors of any such claim it may have against such claimant.

5.     Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution will be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

## F.     PROCEDURES FOR TREATING DISPUTED CLAIMS

1.     Objections

As of the Effective Date, objections to, and requests for estimation of, Administrative Expense Claims and Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation will be served on the respective claimant and filed with the Bankruptcy Court on or before the latest of (i) ninety (90) days after the Effective Date, (ii) ninety (90) days after a proof of Claim has been filed, or (iii) such later date as may be

fixed by the Bankruptcy Court, whether fixed before or after the date specified in clauses (i) and (ii) above.

     2.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, no payment or distribution provided in the Plan shall be made on account of such Administrative Expense Claim or Claim unless and until such Disputed Administrative Expense Claim or Claim becomes Allowed.

     3.      Distributions After Allowance

To the extent that a Disputed Claim or Disputed Administrative Expense Claim, or a portion of a Disputed Claim ultimately becomes Allowed, distributions (if any) will be made to the holder of such Claim in accordance with the provisions of the Plan.  Except with respect to Secured Bond Claims, as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Administrative Expense Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Administrative Expense Claim or Claim the distribution (if any) to which such holder is entitled under the Plan.

     4.      Resolution of Administrative Expense Claims and Claims

On and after the Effective Date, the Reorganized Debtors will have the authority to compromise, settle, otherwise resolve or withdraw any objections to Administrative Expense Claims and Claims against the Debtors and to compromise, settle or otherwise resolve any Disputed Administrative Expense Claims and Disputed Claims against the Debtors without approval of the Bankruptcy Court, other than with respect to Administrative Expense Claims relating to compensation of professionals for fees and expenses incurred prior to the Confirmation Date.

     5.      Estimation of Claims

The Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

G.    **PROVISIONS GOVERNING EXECUTORY
CONTRACTS AND UNEXPIRED LEASES**

1.    Assumption or Rejection of Executory Contracts

The Bankruptcy Code empowers the Debtors to assume or reject their executory contracts and unexpired leases.  All executory contracts and unexpired leases that exist between the Debtors and any person or entity will be deemed assumed by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date or (iii) that is specifically designated as a contract or lease to be rejected on Schedules 8.1(a) (executory contracts) or 8.1(b) (unexpired leases), which schedules will be filed with the Bankruptcy Court no later than five (5) Business Days before the deadline for voting to accept or reject the Plan; *provided, however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, either assumed or rejected as of the Effective Date.  The Debtors will provide notice of any such amendments to the parties to the executory contracts and unexpired leases affected thereby.  The listing of a document on Schedules 8.1(a) or (b) will not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

Notwithstanding anything to the contrary contained in the Plan and the Confirmation Order, the rights and obligations between the Debtors, Debtors-in-Possession and the Reorganized Debtors, on one hand, and Hard Rock Hotel Licensing, Inc. and Hard Rock Café International (STP), Inc., on the other hand, shall be governed by the agreements between the foregoing entities and the Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption of the Hard Rock (i) License Agreement, (ii) Café Lease Agreement and (iii) Retail Store Lease Agreement (Docket No. 189).

2.    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

3.    Inclusiveness

Unless otherwise specified on Schedules 8.1(a) or 8.1(b) described above, each executory contract and unexpired lease listed or to be listed therein is inclusive of any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on such schedule.

4.    Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 8.1 of the Plan, the Debtors will, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20)

days prior to the later of (i) the hearing on the Debtors' motion for assumption or assumption and assignment and (ii) the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-Debtor party to such executory contracts or unexpired leases to be assumed pursuant to Section 8.1 of the Plan, the notice, which will list the cure amount as to each executory contract or unexpired lease to be assumed.  The parties to such executory contracts or unexpired leases to be assumed or assumed and assigned by the Debtors will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court will hold a hearing on a date to be set by the Bankruptcy Court.  Notwithstanding Section 8.1 of the Plan, the Debtors will retain their rights to reject any of their executory contracts or unexpired leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

     5.       <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>

Proofs of claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors on or before the date that is thirty (30) days after the later of (i) the date of service of notice of the Confirmation Date, (ii) notice of modification to Schedules 8.1(a) or 8.1(b) (solely with respect to the party directly affected by such modification) or (iii) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such rejection).  In the event that the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of Claim, will be forever barred and will not be enforceable against the Debtors or the Reorganized Debtors, or their properties or interests in property as agents, successors or assigns.

     6.       <u>Indemnification Obligations</u>

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' prepetition organizational documents or applicable law, will survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

     7.       <u>Insurance Policies</u>

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, will be continued.  Nothing contained in Article VIII of the Plan will constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

     8.       <u>Retiree Benefits</u>

On and after the Effective Date, the Reorganized Debtors will continue to pay all retiree benefits of the Debtors (within the meaning of and subject to section 1114 of the Bankruptcy Code), if any, for the duration of the period for which the Debtors had obligated themselves to provide such benefits and subject to the right of the Reorganized Debtors to modify or terminate such retiree benefits in accordance with the terms thereof.

### H.   GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

#### 1.   General

On the Effective Date, the management, control and operation of the Reorganized Debtors will become the general responsibility of the New Boards of each Reorganized Debtor, respectively.

#### 2.   Amended Organizational Documents

Each of the Reorganized Debtors will be deemed to have adopted its respective Amended Organizational Documents, if any, effective as of the Effective Date.  On the Effective Date, or as soon thereafter as practicable, each of the Reorganized Debtors will file its Amended Organizational Documents, as required or deemed appropriate, with the appropriate Persons in its respective jurisdictions of incorporation or establishment.

#### 3.   New Boards of the Reorganized Debtors

The directors of the Debtors immediately prior to the Effective Date will serve as the initial directors of the Reorganized Debtors on and after the Effective Date.  On the Effective Date, the operation of each of the Reorganized Debtors will become the general responsibility of its New Board, subject to, and in accordance with, its Amended Organizational Documents.

#### 4.   Officers of the Reorganized Debtors

The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the Reorganized Debtors on and after the Effective Date.  Such officers will serve in accordance with applicable non-bankruptcy law, any employment agreement entered into with the Reorganized Debtors on or after the Effective Date and the Amended Organizational Documents.

#### 5.   New Management Agreements

On or after the Effective Date, the Reorganized Debtors may enter into the New Management Agreements.

### I.   CONDITIONS PRECEDENT TO EFFECTIVE DATE

#### 1.   Conditions Precedent to Effectiveness

The Effective Date will not occur and the Plan will not become effective unless and until the following conditions are satisfied in full or waived in accordance with Section 10.2 or 10.3 of the Plan:

(a)   The Confirmation Order shall have been entered and shall have become a Final Order;

(b)   The conditions precedent to the effectiveness of the Exit Facility are satisfied or waived by the parties thereto and the Reorganized Debtors have access to funding under the Exit Facility or alternative sources of funds sufficient to implement the terms of the Plan;

(c)   All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable; and

(d)     All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked.

2.     Waiver of Conditions

Each of the conditions precedent in Section 10.1 of the Plan may be waived, in whole or in part, by the Debtors.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

3.     Satisfaction of Conditions

Any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions precedent specified in Section 10.1 of the Plan have not occurred or otherwise been waived pursuant to Section 10.2 of the Plan, (i) the Confirmation Order will be vacated, (ii) the Debtors and all holders of Claims and interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (iii) the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged and nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## J.     EFFECT OF CONFIRMATION

1.     Vesting of Assets

On the Effective Date, the Debtors, their properties and interests in property, and their operations will be released from the custody and jurisdiction of the Bankruptcy Court, and all property of the estates of the Debtors will vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Reorganized Debtors may operate their business and may use, acquire and dispose of property free of any restrictions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, or the Local Rules of Bankruptcy Procedure, subject to the terms and conditions of the Plan.

2.     Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against, or Equity Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or interests including any Equity Interest of such holder is impaired under the Plan and whether or not such holder is entitled to distribution under the Plan.

3.     Discharge of Claims

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan will discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors will be, and will be deemed to be, discharged and all holders of such Claims will be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date,

whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

### 4.    Discharge

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim and any Affiliate of such holder will be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against the Debtors. Notwithstanding the foregoing, the Indenture Trustee and the holders of Allowed Secured Bond Claims will retain their rights, if any, in and to, and liens upon the Disputed Liquidated Damages Escrow, until resolution by settlement or Final Order of the Disputed Liquidated Damages Claims.

### 5.    **Exculpation**

**Notwithstanding anything in the Plan to the contrary, as of the Effective Date, none of the Debtors, the Reorganized Debtors, the Administrative Agent, the Exit Facility Lenders and the Creditors' Committee, and their respective officers, directors, members, employees, accountants, financial advisors, investment bankers, agents and attorneys and representatives (but, in each case, solely in their capacities as such) will have or incur any liability for any Claim, cause of action or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Reorganization Cases, the formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Reorganization Cases, the Plan, the Disclosure Statement or any contract, instrument, document or other agreement related thereto; *provided, however,* that the foregoing will not affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence.**

The Plan does not provide for broad third-party releases, but rather, limited exculpation for acts during these chapter 11 cases. The exculpation neither affects liability for prepetition actions nor absolves parties from liability for gross negligence or willful misconduct. The Debtors believe the exculpation provision contained in the Plan is appropriate and reasonable.

### 6.    **Injunction or Stay**

**Except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or entities who have held, hold or may hold Claims against the Debtors or Debtors in Possession will be permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim against any of the Reorganized Debtors, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to such Claim, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due to any Reorganized Debtor or against the property or interests in property of any Reorganized Debtor with respect to such Claim and (v) pursuing any Claim released pursuant to Article XI of the Plan.**

**Unless otherwise provided in the Confirmation Order, all injunctions or stays arising under or entered during the Reorganization Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, that are in existence on the Confirmation Date will remain in full force and effect until the Effective Date.**

       7.      <u>Release of Avoidance Actions</u>

As of the Effective Date, the Reorganized Debtors will release any avoidance actions pursuant to sections 544, 547, 548 or 549 of the Bankruptcy Code.

The foregoing descriptions are for informational purposes only and are not an admission by, nor prejudice the rights of, the Debtors and/or the Reorganized Debtors in all respects. Moreover, the descriptions contained herein and in any schedule provided in connection with the Plan are not exclusive. The inclusion or exclusion of any actions herein or on any such schedule is in no way a waiver of any Claim or cause of action whatsoever and all such Claims or causes of action are reserved and preserved. As of the date hereof, no determination has been made as to whether to pursue any such potential claims or causes of action.

## K.      RETENTION OF JURISDICTION

The Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, or related to, the Reorganization Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, the following purposes:

      (a)      To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases, and the allowance of Claims and Administrative Expense Claims resulting therefrom, and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising our of or relating to the Reorganization Cases;

      (b)      To determine any and all adversary proceedings, applications and contested matters, including but not limited to, litigation with respect to the Disputed Liquidated Damages Claims;

      (c)      To hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331, and 503(b) of the Bankruptcy Code;

      (d)      To hear and determine any timely objections to, or requests for estimation of, Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

      (e)      To resolve disputes as to the ownership of any Administrative Expense Claim, Claim or Equity Interest;

      (f)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

      (g)      To issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

      (h)      To consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

      (i)      To hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or

payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

(j)     To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or by the Reorganized Debtors, the Indenture Trustee, or the Reorganized Debtors after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

(k)     To hear and determine all disputes involving the existence, scope, nature or otherwise of the discharges, releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

(l)     To issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(m)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     To hear and determine any rights, Claims or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

(o)     To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(p)     To enter a final decree closing the Reorganization Cases; and

(q)     To hear any other matter not inconsistent with the Bankruptcy Code.

## L.     MISCELLANEOUS PROVISIONS

1.     Effectuating Documents and Further Transactions

On or before the Effective Date, and without the need for any further order or authority, the Debtors will file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Reorganized Debtors are authorized under the Plan to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

2.     Withholding and Reporting Requirements

Any party issuing any instrument or making any distribution under the Plan will comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution

under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

3.  Corporate Action

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors or members of the Debtors or Reorganized Debtors, including, without limitation, the effectiveness of the Amended Organizational Documents, the election or appointment, as the case may be, of members, directors and officers of the Reorganized Debtors pursuant to the Plan and the authorization and approval of the New Management Agreements, if any, will be in effect from and after the Effective Date pursuant to the applicable general corporation or other organizational law of the states in which the Debtors or the Reorganized Debtors are incorporated, without any requirement of further action by the members, stockholders or directors of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors will, if required, file their amended organizational documents with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

4.  Modification of Plan

Amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code and the Debtors have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan of Reorganization without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

5.  Revocation or Withdrawal of the Plan

Subject to the consent of the Administrative Agent, the Debtors reserve the right to revoke or withdraw the Plan, in whole or in part, prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan in whole prior to the Confirmation Date, then the Plan will be deemed null and void. In such event, nothing in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors. The Debtors reserve the right to withdraw the Plan with respect to any Debtor and proceed with confirmation of the Plan with respect to any other Debtor. In such event, nothing in the Plan will constitute or be deemed a waiver or release of any Claims against or Equity Interests in such Debtors withdrawn from the Plan or any other person or to prejudice in any manner the rights of the withdrawn Debtor or any person in any further proceedings involving such withdrawn Debtors.

6.      Payment of Statutory Fees

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid on the Effective Date.

7.      Post-Confirmation Date Professional Fees and Expenses

From and after the Confirmation Date, the Reorganized Debtors will, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred by the Reorganized Debtors.

8.      Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Reorganization Cases, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, accountants and other agents, if any, will terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

9.      Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, Exit Facility, any merger agreements or agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

10.     Expedited Tax Determination

The Debtors and the Reorganized Debtors are authorized under the Plan to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all returns filed for, or on behalf of, the Debtors for any and all taxable periods (or portions thereof) ending after the Commencement Date through and including the Effective Date.

11.     Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan provides otherwise (in which case the governing law specified therein shall be applicable to such exhibit), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to its principles of conflict of laws.

# VII.

## PROJECTIONS AND VALUATION ANALYSIS

**A.     CONSOLIDATED CONDENSED PROJECTED FINANCIAL STATEMENTS**

1.      Responsibility for and Purpose of the Projections

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct its business.

2.      Pro Forma Financial Projections

The Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation, or the need for further financial reorganization of the Debtors or any successor under the Plan.

The Debtors believe their existing cash plus proceeds from the Exit Facility provide sufficient funds to make all payments required under the Plan and to complete reconstruction of the Resort.  Annexed to the Disclosure Statement as Exhibit B is a Pro Forma Sources and Uses as of May 1, 2007 ("Sources and Uses") indicating the sources and uses of cash in connection with implementation and consummation of the Plan.  The Debtors believe cash flow from operations following the opening of the Resort will enable them to satisfy their future obligations in the ordinary course of their business.

PEB does not, as a matter of course, publish its business plans and strategies or projections or its anticipated financial position or results of operations.  Accordingly, PEB does not anticipate that it will, and disclaims any obligation to, furnish updated business plans or projections to holders of Claims or Equity Interests after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission (if any) or otherwise make such information public.

**THE SOURCES AND USES WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE SOURCES AND USES HAVE NOT BEEN AUDITED BY INDEPENDENT ACCOUNTANTS.**

**ALTHOUGH EVERY EFFORT WAS MADE TO BE ACCURATE, THE PROJECTED SOURCES AND USES ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTED SOURCES AND USES. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE DEBTORS, THEIR ADVISORS, OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED.  THE PROJECTED SOURCES AND USES WERE NOT PREPARED WITH A VIEW TOWARDS PUBLIC DISCLOSURE OR COMPLIANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, THE PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE**

COMMISSION OR THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS OR FORECASTS.  THE PROJECTED SOURCES AND USES HAVE NOT BEEN AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT CERTIFIED ACCOUNTANTS.  IMPAIRED CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE PROJECTED SOURCES AND USES IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

The Projected Sources and Uses assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of Reorganized PEB, and (iii) except as described herein, there will be no material contingent or unliquidated litigation or indemnity Claims applicable to the Reorganized Debtors.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.**  The Projected Sources and Uses and this Disclosure Statement contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995.  "Forward-looking statements" in the Projected Sources and Uses and this Disclosure Statement include the intent, belief or current expectations of PEB and members of their management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and PEB's future liquidity, as well as the assumptions upon which such statements are based. While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Projected Sources and Uses include, but are not limited to, adverse developments with respect to PEB's liquidity position or operations of PEB's business, adverse developments in the timing or results of PEB's strategic business plan, the ability of PEB to retain and attract guests to the Resort and maintain favorable vendor relationships, the difficulty in controlling industry costs and the ability of PEB to realize the anticipated general and administrative expense savings and overhead reductions presently contemplated, the level and nature of any restructuring and other one-time charges, the difficulty in estimating costs and the possible negative effects of a change in applicable legislation.

**VIII.**

**CERTAIN FACTORS AFFECTING THE DEBTORS**

**A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2.      Non-Consensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.  See Section IX below, entitled "CONFIRMATION OF THE PLAN OF REORGANIZATION - Requirements for Confirmation of the Plan of Reorganization - Requirements of Section 1129(b) of the Bankruptcy Code."

3.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

**B.     ADDITIONAL FACTORS TO BE CONSIDERED**

1.      Business Factors and Competitive Conditions

(a)     Operating Conditions.  As discussed above, the Debtors believe their existing cash plus proceeds from the Exit Facility provide sufficient funds to make all payments required under the Plan and to complete reconstruction of the Resort.  PEB's ability to consummate the Plan is not dependent upon operations.  PEB[18] has no operating history or history of earnings.  Following reconstruction, the Resort will be a new business and, accordingly, will be subject to all of the risks inherent in the establishment of a new business enterprise.  Although members of PEB management team have experience in the gaming industry, neither PEB nor any of its equity holders has any experience designing, developing, constructing, marketing, equipping, opening or operating a gaming facility.  No assurance can be given that PEB will be able to attract a sufficient number of guests, gaming customers and other visitors to the Resort in order to make operations profitable.

The Resort's operations will be subject to the significant business, economic, regulatory and competitive uncertainties and contingencies frequently encountered by new businesses in competitive environments such as the gaming industry, many of which are beyond PEB's control.  Because PEB has no operating history, it may be more difficult for it to prepare for and respond to these types of risks and the risks described elsewhere in this document than for a company with an established business and operating cash flow.  If PEB is unable to manage these risks successfully, it could negatively impact its operations.

Until reconstruction of the Resort is completed, PEB will rely exclusively on funds received from Insurance Proceeds or a refinancing to fund its operations.  Upon reconstruction and reopening, PEB will rely exclusively on cash flow generated by the Resort.  PEB's ability to generate cash flow will depend on the future operating performance of the Resort, which is subject to many financial, economic, competitive, regulatory, business and other factors, including casualty losses or forces of nature that PEB is unable to predict or control.  The impact of these factors could be more

---

[18] As PEB is the operating arm of the Debtors, in this Section VIII.B., the term "PEB" will be used to discuss the collective Debtors' operating history and business plans.

significant to PEB than it would be to a diversified gaming company since PEB will rely solely on the revenues generated by the Resort to fund ongoing operations and other company obligations.

      (b)   <u>Competitive Conditions</u>. Prior to Hurricane Katrina, there were sixteen casinos located within 100 miles of the Resort, with PEB facing competition primarily from other gaming facilities located in the Mississippi Gulf Coast market. Casinos in proximity to the Resort currently include seven in Biloxi, one in Gulfport and two in Hancock County.

      In the aftermath of Hurricane Katrina, the Mississippi Gulf Coast gaming market is in a rebuilding and redevelopment stage and the State of Mississippi has passed a law allowing for shore-based gaming within eight hundred feet of the mean tide. This change in law has created a significant increase in the availability of potential gaming sites along the Mississippi Gulf Coast, which could result in the development of substantially more casinos competing against PEB. Moreover, the Mississippi Gaming Commission does not limit the number of casino licenses it will grant. Therefore, PEB may encounter future competition from new projects which may negatively impact its business.

      Once rebuilt, the Resort will also compete with casinos located in Louisiana, Mississippi, and various other states, riverboats and Native American gaming ventures. PEB also faces competition from state-sponsored lotteries, on- and off-track wagering, card parlors, racinos, internet gaming and other forms of gaming in the United States, as well as from gaming on cruise ships and international gaming operations. In addition, certain states have recently legalized or are considering legalizing casino gaming.

      Many of PEB's competitors with established gaming operations prior to Hurricane Katrina may have greater financial resources than PEB. In addition, five of the facilities in the Gulf Coast market are owned by public companies. Those companies are able to capitalize on their other properties, customer loyalty programs, corporate marketing budgets, access to capital and reputation to drive customers to their location. Penn National Gaming, Inc. owns two facilities in the market, which allows for consolidation of certain administrative functions and the ability to cross-market to casino customers for both properties.

      As a result of these conditions, PEB may be unable compete successfully, which would have a negative impact on its ability to generate sufficient revenues and cash flow to operate its business.

      (c)   <u>Competition from other "Hard Rock" enterprises</u>. PEB has the exclusive right to use the "Hard Rock" trademark for one hotel, casino, and Hard Rock Live! venue in the Mississippi Gulf Coast market. However, the "Hard Rock" name may also be used in the Mississippi Gulf Coast market by other parties for any other type of facility other than a Hard Rock Café, Hard Rock Live! venue or Hard Rock Hotel and Casino. In addition, the "Hard Rock" name can be used by any hotel, casino, restaurant or other facility outside of the Mississippi Gulf Coast market, including nearby areas that permit gaming. Currently, the "Hard Rock" name is licensed for the Hard Rock Hotel Universal Studios Orlando, the Hard Rock Hotel & Casino in Tampa, Florida, the Hard Rock Hotel & Casino in Hollywood, Florida, the Hard Rock Hotel in Chicago, Illinois, the Hard Rock Condo Hotel in San Diego, California and the Hard Rock Hotel & Casino in Las Vegas. These and other "Hard Rock" branded casinos, hotels, restaurants or other establishments in the Mississippi Gulf Coast market or elsewhere could compete with PEB for customers.

      PEB benefits from the global brand name recognition and reputation generated by the over 100 Hard Rock Cafés and other Hard Rock venues. There can be no assurance, however, that these establishments operate in a manner that will not adversely affect PEB or the recognition and reputation of the global brand name. Any adverse impact on this brand name will adversely affect the Resort.

Additionally, PEB will depend on the "Hard Rock" brand to draw customers. The brand may not appeal to all potential customers. Moreover, customer preferences and trends can change, often without warning, and PEB may not be able to predict or respond to changes in customer preferences in time to adapt to such changes.

(d)     Governmental Approvals. The operation of the Resort is contingent upon various governmental approvals from the State of Mississippi. A revocation, suspension, limitation or condition on any of PEB's gaming licenses or registrations could result in a material adverse effect to the business.

The Mississippi Gaming Commission found suitable PEB's direct members, indirect members and senior management on January 20, 2005, and PEB was issued a Mississippi Gaming License to own and operate the Resort. There is no guarantee that such gaming licenses or registrations will not be revoked, suspended or limited. If PEB's gaming licenses and/or registrations are revoked for any reason, the Mississippi Gaming Commission could require PEB to close the Resort, which would have a material adverse effect on PEB's business. Failure to maintain such approvals could prevent or delay the completion of reconstruction or opening of the Resort, or otherwise affect the design and features of PEB's operation of the Resort, all of which could materially and adversely affect PEB's financial position and results of operations.

(e)     Geographic Dependence. The revenues and cash flow of the Resort will be heavily dependent upon the patronage of persons living in and visiting the Mississippi Gulf Coast market. Therefore, PEB will be subject to more significant fluctuations in its operating results than a geographically diversified gaming company due to factors such as:

- a downturn in local or regional economic conditions;

- an increase in competition in the surrounding area;

- inaccessibility to the hotel/casino due to road construction or closures of primary access routes; and

- natural and other disasters in the surrounding area, including hurricanes, flooding and fire.

PEB's dependence on a particular geographic area has been highlighted by the impact of Hurricane Katrina. If PEB is unable to generate sufficient cash flow, it may need to refinance or restructure its debt, reduce or delay capital investments or seek to raise additional capital in order to service its obligations. These measures may not be available to PEB or, if available, they may not be sufficient or on satisfactory terms to enable PEB to satisfy its obligations.

(f)     Limited Hard Rock License. PEB has signed a twenty-year license agreement with Hard Rock, providing for two successive ten-year renewal terms, under which PEB has the exclusive right to use and develop the "Hard Rock" brand name in connection with a hotel and casino resort in Biloxi, Mississippi. The Hard Rock License Agreement may be terminated by Hard Rock under certain circumstances. In the event of such termination, PEB would need to develop a new marketing and branding strategy to attract and retain patrons, resulting in a significant increase in advertising expenditures. Any such new strategy may not be successful, and if PEB becomes unable to attract and retain patrons to its re-branded gaming facility, it may be unable to generate sufficient cash flows. Additionally, any such termination of the Hard Rock License Agreement would result in an event of default under the investment agreement governing the Rank Note.

(g)     <u>Hard Rock Retail, Café and Memorabilia Leases</u>.  The Hard Rock Café, the Hard Rock retail store and the display of rare rock memorabilia throughout the property are cornerstones to the company's strategy of successfully employing the "Hard Rock" brand name.  Any early termination of the Hard Rock License Agreement with Hard Rock will result in the early termination of the Hard Rock Lease Agreements.  Any termination of the Hard Rock Lease Agreements prior to their stated expiration will significantly diminish PEB's ability to successfully employ the "Hard Rock" brand, negatively impacting PEB's operations.

(h)     <u>Dependence on Key Personnel</u>.  PEB's ability to maintain its competitive position is dependent to a large degree on the efforts and skills of its senior management team, including Joseph Billhimer.  PEB will rely on Mr. Billhimer's knowledge of the local market and experience in opening and operating casinos in the Mississippi Gulf Coast market.  The loss of Mr. Billhimer's services for any reason could adversely affect the company.  In addition, PEB will need to hire additional qualified management in the future and may be unable to do so.

The operation of the Resort will require PEB to recruit a substantial number of qualified employees with gaming and hospitality industry experience and the qualifications necessary to obtain any required gaming licenses.  There can be no assurances that PEB will be able to recruit, train and retain a sufficient number of qualified employees necessary to operate the Resort given the limited pool of and the competition for qualified and experienced gaming and other personnel in the Mississippi Gulf Coast market.  This effort may be further impeded by the impact of Hurricane Katrina, which forced many former residents to relocate outside of the Mississippi Golf Coast area.  If PEB is unable to recruit, train and retain a sufficient number of qualified employees, PEB may unable to offer the level of customer service and amenities that the Resort intends to offer.

(i)     <u>Location of the Casino</u>.  PEB's rights to continue to locate the casino structure at the proposed site of reconstruction of the Resort will be subject to the tidelands lease with the State of Mississippi, which may be terminated by the State of Mississippi under certain circumstances.  The failure to maintain the tidelands lease would require PEB to relocate the casino to a land based structure, which would have a material adverse effect on its business, financial condition, results of operations and its ability to generate sufficient revenues and cash flows necessary to operate its business.

(j)     <u>Collection of Gaming Debts</u>.  PEB will conduct its gaming activities on both a credit and cash basis.  This credit will be unsecured.  Table games players typically will be extended more credit than slot players, and high-stakes players typically will be extended more credit than patrons who tend to wager lower amounts.  While gaming debts evidenced by a credit instrument, including what is commonly referred to as a "marker," and judgments on gaming debts are enforceable under current state and federal laws, other states may determine that direct enforcement of gaming debts is against public policy.  PEB may not be able to collect the full amount of gaming debts owed to it, even in jurisdictions that enforce gaming debts.  Its inability to collect gaming debts could have a significant negative impact on its operating results.

(k)     <u>Compliance with Environmental Regulations</u>.  PEB plans to operate the business near and over the water on the Mississippi Gulf Coast.  The company is, and upon reconstruction of the Resort, will be, subject to various federal, state and local laws, ordinances and regulations which (1) govern activities or operations that may have adverse environmental effects, such as discharges to air and water, as well as the handling and disposal of hazardous material or solid or hazardous wastes, and (2) may impose joint and several liability on current and former property owners or operators for the costs of investigation, removal and remediation of hazardous substances or wastes related to the environment without regard to fault.  These laws typically impose cleanup responsibility and liability without regard to whether the owner or operator knew of or caused the presence of the contaminants.  The liability under

such laws has been interpreted to be joint and several unless the harm is divisible and there is a reasonable basis for allocation of the responsibility. The costs of investigation, remediation or removal of those substances may be substantial, and the presence of those substances, or the failure to remediate a property properly, may impair PEB's ability to rent or otherwise use the property.

As the owner of the property on which the Resort will be situated, PEB may be required to investigate and clean up hazardous or toxic substances or chemical releases at that property. As an owner or operator, PEB could also be held responsible to a governmental entity or to third parties for property damage, personal injury and investigational and cleanup costs incurred by them in connection with any contamination.

PEB currently has not identified any such issues associated with its property that could reasonably be expected to have an adverse effect on the company or the results of its operations. However, it is possible that historical or neighboring activities have affected, or the construction and operation of the Resort will affect, the Resort property and, as a result, material obligations or liabilities under environmental laws could arise in the future which may have a material adverse effect on the company or its operations.

2.    <u>General Economic Risks</u>

(a)    <u>Terrorism, acts of war and other factors affecting discretionary consumer spending</u>. The ongoing threat of terrorist activities involving the United States both domestically and elsewhere, as well as the ongoing uncertainty of war have had a negative impact on travel and leisure expenditures, including lodging, gaming and tourism. PEB cannot predict the extent to which these events may affect its business, directly or indirectly, in the future. In addition to fears of war and future acts of terrorism, other factors affecting discretionary consumer spending (including general economic conditions, disposable consumer income, fears of a recession and reduced consumer confidence in the economy) may negatively impact PEB's business. An extended period of reduced discretionary spending and/or disruptions or declines in airline travel and leisure travel could significantly harm the company's operations.

The strength and profitability of PEB's business will depend on consumer demand for hotel casino resorts, generally, and for the type of amenities the Resort will offer, specifically. Changes in consumer preferences or discretionary consumer spending on leisure activities could harm PEB's business.

(b)    <u>Fuel Prices</u>. PEB will rely on the ability of the customers of the Resort to fly or drive to the Resort. Increases in the cost of fuel increase the cost to potential customers of the Resort of traveling to the Resort. These costs may decrease the company's ability to attract customers, which may result in reduced visitation to the Resort and a reduction in revenues, which could harm the company's business.

(c)    <u>Taxes</u>. Although there are currently no direct federal taxes imposed on gaming revenues, legislators have proposed the imposition of such taxes in the past. There can be no assurance that federal legislators will not impose taxes on gaming revenues in the future. In addition, the Resort will be subject to an effective 12% state tax on its net gaming revenues in Mississippi, as well as federal and state income taxes, and these taxes are subject to increase at any time. The introduction of new taxes or the increase in the rates of existing taxes could have a material adverse effect on PEB's business, financial condition, and results of operations.

3.    <u>Reliance on Market Data</u>. PEB has based the market data provided in this Disclosure Statement with respect to the Mississippi Gulf Coast market and other hotels and casinos on market

research, publicly available information and industry publications much of which may no longer be accurate following Hurricane Katrina. PEB not independently verified any such information and it is possible that the market data may not be accurate in all material respects. Additionally, because the Resort is in the process of being redeveloped, quantitative information regarding the Resort, including square-footage and number of rooms, gaming devices, gaming positions and parking spaces are estimates based on current plans and are subject to change. Accordingly, you should not rely on such data. The Mississippi Gulf Coast Market is subject to continual change, especially in the aftermath of Hurricane Katrina, including changes in the number of facilities expanding, closing and opening, and changes in the size of such facilities. For these and other reasons, PEB's estimates of the Resort's future market position could prove to be materially inaccurate.

4.     Conflicts of Interest

Roy Anderson, III, a member of GAR, LLC (the sole member of PEB) and a member of PEB's board of managers, is the President and Chief Executive Officer of RAC, the general contractor of the Resort. PEB has entered into certain agreements with RAC, each of which PEB believes is on terms that are similar to and no less favorable to the company than those that otherwise could have been obtained from third parties.

5.     The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

6.     No Representations Outside This Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Reorganization Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

7.     Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

8.     No Legal or Tax Advice is Provided to You By This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each creditor or Equity Interest holder should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you.  This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

        9.     <u>No Admission Made</u>

        Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

        10.    <u>Business Factors and Competitive Conditions</u>

        (a)    <u>General Economic Conditions</u>.  In their financial projections, the Debtors have assumed that the general economic conditions of the United States economy will be stable over the next several years.  The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors.  There is no guarantee that economic conditions will improve in the near term.

        (b)    <u>Business Factors</u>.  PEB believes that it will succeed in implementing and executing its business plan and operational restructuring for benefits of all constituencies.  However, there are risks that the goals of PEB's going-forward business plan and operational restructuring strategy will not be achieved.  In such event, PEB may be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.  In the event of further restructurings or insolvency proceedings, the Equity Interests of such persons could be substantially diluted or even cancelled.

## C.    CERTAIN TAX MATTERS

        For a summary of certain federal income tax consequences of the Plan to holders of Claims and to the Debtors, see Section XII below, entitled "CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

**IX.**

**CONFIRMATION OF THE PLAN OF REORGANIZATION**

## A.    CONFIRMATION HEARING[19]

        Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.  As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the confirmation hearing for _____, 2007.  The confirmation hearing may be adjourned from time-to-time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

---

[19] Court to set dates.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate or property, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon Byrd & Wiser, P.O. Box 1939, Biloxi, MS 39533, Attn: Robert Alan Byrd, counsel for the Debtors, so as to be received no later than __:__ _.m. (prevailing Central Time) on _____.

Objections to confirmation of the Plan of Reorganization are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## B.   REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

1.   <u>Requirements of Section 1129(a) of the Bankruptcy Code</u>

(a)   <u>General Requirements</u>.  At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

(1)   The Plan complies with the applicable provisions of the Bankruptcy Code.

(2)   The Debtors have complied with the applicable provisions of the Bankruptcy Code.

(3)   The Plan has been proposed in good faith and not by any means proscribed by law.

(4)   Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization Cases, or in connection with the Plan and incident to the Reorganization Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(5)   The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan of Reorganization, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider.

(6)   With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not

less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

(7)    Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

(8)    Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

(9)    At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(10)    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility" below.

(11)    The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

(b)    <u>Best Interests Test</u>. As described above, the Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the time of the commencement of the chapter 7 case. The next step, is to reduce that total by the amount of any claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation. Any remaining net Cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code (see discussion below). Finally, taking into account the time necessary to accomplish the liquidation, the present value of such allocations may be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee in bankruptcy, as well as those that might be payable to attorneys and other professionals that such a trustee may engage, plus any unpaid expenses incurred by the Debtors during the chapter 11 case and allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals, and costs and expenses of members of any statutory committee of unsecured creditors appointed by the United States Trustee pursuant to section 1102 of the Bankruptcy Code and any other committee so appointed. Moreover, in a chapter 7 liquidation, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or leases entered into by the Debtors both prior to, and during the pendency of, the chapter 11 cases.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, with interest, and no equity holder receives any distribution until all creditors are paid in full, with interest. Since holders of Allowed Claims will be paid in full under the Plan, the Plan satisfies the rule of absolute priority.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in a chapter 11 case, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) substantial increases in claims which would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each creditor and equity holder with a recovery that is not less than it would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims in a chapter 7 case would be the same or less than the value of distributions under the Plan because such distributions in a chapter 7 case may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a year or more after the completion of such liquidation in order to resolve the claims and prepare for distributions. In the event litigation were necessary to resolve claims asserted in the chapter 7 case, the delay could be further prolonged and administrative expenses further increased.

(c)    Feasibility. The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. As set forth in Pro Forma Projected Sources and Uses as of May 1, 2007, annexed as Exhibit B, the Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

2.    Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

*No Unfair Discrimination.*  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

*Fair and Equitable Test.*  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

- *Secured Claims.*  Each holder of an impaired secured claim either (i) retains its Liens on the property (or if sold, on the proceeds thereof) to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim or (ii) receives the "indubitable equivalent" of its allowed secured claim.

- *Claims.*  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

- *Equity Interests.*  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

## X.

## FINANCIAL INFORMATION

A projected balance sheet as of May 1, 2007, the Form 10-K for the fiscal year ended December 31, 2005, and the Form 10-Q for the quarter ended June 30, 2006, and the related consolidated statements of operations and consolidated statements of cash flows of PEB and Premier Finance are contained in Exhibits C, D and E to this Disclosure Statement, and the full text of which is incorporated herein by reference.  This financial information is provided to permit the holders of Claims and Equity Interests to better understand the Debtors' historical business performance and the impact of the Reorganization Cases on the Debtors' business.

## XI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF REORGANIZATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

## A.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy

Code.  Since holders of Allowed Claims will be paid in full, no liquidation analysis is necessary with respect to claims.

Under any scenario and any chapter of the Bankruptcy Code, creditors can never recover more than 100% of their Allowed Claims plus interest.  Here, since the Plan provides for such payment, the amount proposed to be paid is not less than the amount creditors would receive under Chapter 7.  As a result, no liquidation analysis is necessary with respect to claims.  *See generally in re Dow Corning Corp.*, 237 B.R. 380, 412 (Bankr. E.D. Mich. 1999) ("[T]he most that an unsecured creditor is entitled to receive in a chapter 7 proceeding is the value of its claim as of the petition date plus post-petition 'interest at the legal rate.'  Once an unsecured claim is paid in accordance with the above formula, it is satisfied and the claimant will have no further recourse against the debtor.  Were this not the case, Congress would not have expressly provided for estate proceeds remaining after such distribution to be returned to the debtor.  If a chapter 11 plan of reorganization proposes such a distribution scheme, as the Plan does, this aspect of the plan a fortiori satisfies § 1129(a)(7)'s best-interest-of-creditors test.") (internal citation omitted); *In re Valley View Shopping Ctr.*, L.P., 260 B.R. 10, 30 (Bankr. D. Kan. 2001) ("Because the best interest of creditors test only requires that a plan not provide less than what creditors would receive in Chapter 7 liquidation, the instant Plan satisfies § 1129(a)(7).  It is impossible for Debtor's creditors to receive more than payment in full with interest in a Chapter 7 liquidation."); *In re Bouy, Hall & Howard & Assocs.*, 141 B.R. 784, 792 (Bankr. S.D. Ga. 1992) ("Since the dissenting creditors will receive 100% of their allowed claims the provisions of Section 1129(a)(7) are satisfied."); *In re Sound Radio, Inc.*, 93 B.R. 849, 854 (Bankr. D.N.J. 1988) (finding it unnecessary to determine exact liquidation value because "[t]he only finding that need be made under an 11 U.S.C. § 1129(a)(7) analysis is that the various interests will get at least as much under the plan as they would in a liquidation.  This court must therefore conclude that under either … plan, creditors would receive as much as they would in liquidation, since they each would get 100 percent of their claim plus interest.").

The Debtors believe that the distribution to equity interest holders under the Plan will be at least as much as such holders would receive in a chapter 7 case.  Under chapter 7, a trustee would be appointed to administer the estates, to resolve pending controversies including Disputed Claims, to liquidate the Debtors' assets, and to make distributions to creditors and equity interest holders.  A general discussion regarding a hypothetical liquidation of the Debtors' assets under this type of chapter 7 scenario is set forth below.

Conversion to chapter 7 would likely result in additional administrative expenses, a substantial delay in making distributions to holders of equity interests, and a reduced distribution to equity interest holders as compared to the anticipated results of confirmation of the Plan.  Although the Debtors believe they are solvent, they do not have sufficient cash to satisfy even their secured claims.  Thus, absent confirmation of the Plan including entry into the Exit Facility, assets would have to be liquidated for creditors to be paid.  A chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in section 326 of the Bankruptcy Code.  A chapter 7 trustee might also seek to retain new professionals, including attorneys and accountants, in order to resolve any Disputed Claims and possibly to pursue claims of the jointly administered estates against other parties.  The trustee and any such new professionals retained by the trustee would need to spend time familiarizing themselves with the history of the chapter 11 cases and the nature of the Debtors' assets and liabilities, which could result in duplication of effort, increased expense and delay in payment to creditors.  Under the Federal Rules of Bankruptcy Procedure, a new bar date for the filing of proofs of claim would have to be set, and additional claims against the estates that might now be time-barred (because they were not filed before the applicable Bar Dates in the chapter 11 cases) could be asserted.

Even if the trustee were authorized to operate the Debtors' business, the trustee would likely not have the required expertise to rebuild, maintain and preserve and ultimately operate the Resort.

Moreover, the trustee would not have the ability to promptly raise the necessary funds from private and public markets to complete the build-out of the Resort. The trustee would also lose the support of the Debtors' current investors.

Due to the numerous uncertainties and time delays associated with liquidation under chapter 7 of the Bankruptcy Code, it is not possible to predict with certainty the outcome of any chapter 7 liquidation of the Debtors or the timing of any distribution to creditors. However, based on the Plan and the information set forth herein, the Debtors have concluded that equity interest holders will receive at least as much under the Plan as they would receive in a complete liquidation under chapter 7 of the Bankruptcy Code.

## B.   ALTERNATIVE PLAN OF REORGANIZATION

If the Plan of Reorganization is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets under chapter 11. The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances. In a liquidation under chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, possibly resulting in somewhat greater (but indeterminate) recoveries than would be obtained in chapter 7. Further, if a trustee were not appointed, because such appointment is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than those incurred in a chapter 7 case. Although preferable to a chapter 7 liquidation, the Debtors believe that any alternative liquidation under chapter 11 is a much less attractive alternative to creditors and equity holders than the Plan because of the greater return provided by the Plan.

## XII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are not impaired (e.g., Administrative Expense Claims, Other Priority Claims, and Other Secured Claims). In addition, the following summary does not address the federal income tax consequences to holders of Equity Interests or their Affiliates.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, persons holding an equity interest as part of an integrated constructive sale or straddle, and investors in pass-through entities).

*Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.*

*IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests are hereby notified that: (A) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims or Equity Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

## A.   CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

Pursuant to the Plan, the holder of the Peoples Bank Secured Claim (Class 4) will receive on the Effective Date, in satisfaction and discharge of its Claim, an amount of Cash equal to the principal amount of such Claim, plus interest through the Effective Date at a 7% rate. Holders of Allowed PEB Secured Bond Claims (Class 5) and Allowed Premier Finance Secured Bond Claims (Class 6) will receive, in satisfaction and discharge of their Claims, their Ratable Proportion of (i) an amount of Cash, to be received on the Effective Date, equal to the principal amount of the Bonds outstanding on the Effective Date, plus accrued interest through the Effective Date, and (ii) promptly after resolution of the Disputed Liquidated Damages Claims by Final Order, the amount, if any, of the Disputed Liquidated Damages Escrow to which Bondholders are entitled. Holders of Allowed PEB General Unsecured Claims (Class 7) and Allowed Premier Finance General Unsecured Claims (Class 8) will receive, in satisfaction and discharge of their Claims (including postpetition interest), Cash in an amount equal to fifty percent (50%) of their Allowed Claims on the Effective Date and the remaining fifty percent (50%) within sixty (60) days thereafter, plus interest.

In general, each holder of an Allowed PEB Secured Bond Claim, Premier Finance Secured Bond Claim, PEB General Unsecured Claim or Premier Finance General Unsecured Claim should recognize gain or loss in an amount equal to the difference between (x) the amount of Cash received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest, and other than any post-Effective Date interest and any amount treated as imputed interest as further discussed below) and (y) the holder's adjusted tax basis in its Claim (other than any basis attributable to accrued but unpaid interest). *See also* section XII.B, below ("Treatment of the Disputed Liquidated Damages Escrow").

Holders of an Allowed PEB General Unsecured Claim and Premier Finance General Unsecured Claims will receive distributions subsequent to the Effective Date. It is possible that a portion of any gain realized by such holders may be deferred until its full distribution is received.

In addition, under the Tax Code, a portion of any amounts distributable subsequent to the Effective Date to holders of Allowed PEB General Unsecured Claims or Allowed Premier Finance General Unsecured Claims may be treated as imputed interest (in the event the applicable short-term federal rate is higher than the rate of interest under the Plan). To the extent so treated, such holder will be treated as receiving in satisfaction of its Claim for federal income tax purposes an amount less than the full amount of its Claim. Pursuant to the Plan, distributions to any holder of an Allowed Claim will be allocated first to the original principal amount of such Claim as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of the Claim, such as any portion of the Claim representing accrued but unpaid interest or original issue discount ("OID"). However, there is no assurance that the IRS would respect such allocation.

To the extent that an amount received by a holder of debt is received in satisfaction of a portion of its Claim representing accrued interest or OID during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally will recognize a deductible ordinary loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. However, the treatment of unpaid OID that was previously included in income is less clear. The IRS has privately ruled that a holder of a security, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is possible that, by analogy, a holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to any previously included OID that is not paid in full.

Where gain or loss is recognized by a holder of an Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously had claimed a bad debt deduction.

## B.      TREATMENT OF THE DISPUTED LIQUIDATED DAMAGES ESCROW

Pursuant to the Plan, the Debtors will transfer the Disputed Liquidated Damages Amount in Cash to the Disputed Liquidated Damages Escrow, to be held in a segregated account maintained by U.S. Bank for the benefit of the holders of Allowed PEB Secured Bond Claims and Premier Finance Secured Bond Claims. Any amounts remaining in the Disputed Liquidated Damages Escrow to which the holders of Allowed PEB Secured Bond Claims and Premier Finance Secured Bond Claims are not entitled (after deduction of fees and expenses of the account, including taxes) will revert to the Reorganized Debtors.

Under section 468B(g) of the Tax Code, amounts earned by an escrow account, settlement fund or similar fund must be subject to current tax. Under recently issued Treasury Regulations, a court-monitored fund established to hold money or other property subject to conflicting claims of ownership generally is treated as a "disputed ownership fund," unless satisfying the more specific requirements for qualified settlement fund treatment. Accordingly, pursuant to the Plan, and subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, U.S. Bank will (i) treat the Disputed Liquidated Damages Escrow as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (ii) to the extent permitted by applicable law, report consistently for state and local income tax purposes. In addition, pursuant to the Plan, all parties must report consistently with such treatment.

A disputed ownership fund is subject to a separate entity level tax, in a manner similar to either a corporation or a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.,* depending upon the nature of the assets transferred to the fund. In the present case, the Disputed Liquidated Damages Escrow will be taxable similar to a qualified settlement fund. So treated, the Disputed Liquidated Damages Escrow will be subject to a separate entity tax at the maximum rate applicable to trusts and estates (currently 35%).

In determining the taxable income of the Disputed Liquidated Damages Escrow, (a) any amounts transferred by the Debtors to the escrow will be excluded from the escrow's income; (b) any interest income or other earnings with respect to the escrow's assets will be included in the escrow's income; and (c) any administrative costs (including state and local taxes) incurred by the escrow will be deductible by the escrow.

Distributions from the Disputed Liquidated Damages Escrow to holders of Allowed PEB Secured Bond Claims and Premier Finance Secured Bond Claims should be taxed to such holders in the same manner as if such amounts were received directly from the Debtors. Although not expected, if upon the termination of the Disputed Liquidated Damages Escrow such escrow has unused tax loss or credit carryforwards, the Treasury Regulations would allocate the carryforwards among all or part of the holders of Allowed PEB Secured Bond Claims, Premier Finance Secured Bond Claims and the Reorganized Debtors.

## C.    INFORMATION REPORTING AND WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

***The foregoing summary has been provided for informational purposes only. All holders of Claims receiving a distribution under the Plan are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.***

## XIII.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Classes 4-8 and 10 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than __:__ _.m. (prevailing Central Time) on _____.[20]

---

[20] Court to set dates.

Dated:  February 22, 2007

Respectfully submitted,

PREMIER ENTERTAINMENT BILOXI LLC (D/B/A/ HARD
ROCK HOTEL & CASINO BILOXI)
PREMIER FINANCE BILOXI CORP.


By: _____
Name: Robert Coleman
Title: Sec'y \Gen. Consel